Dwayne WEEKS, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Nos. 345 & 359, 1993.

Supreme Court of Delaware.

Submitted: Nov. 15, 1994.
Decided: Feb. 10, 1995.

Anthony A. Figliola (argued), Figliola & Facciolo, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Cynthia R. Kelsey and Marsha J. Epstein, Wilmington, for appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en banc.

HARTNETT, Justice:

This is the direct appeal from the decision of the Superior Court to accept Dwayne Weeks' ("Weeks") plea of guilty to the murders of Gwendolyn Weeks ("Gwendolyn") and Craig Williams and to impose the death sentence on him.

Weeks raises two issues. First, he argues that the Superior Court's failure during the plea colloquy to inquire into the results of Weeks' recent psychiatric evaluation renders the guilty plea involuntary. Second, he argues that the death sentence imposed upon him is disproportionate to sentences imposed for similar crimes and, therefore, violates 11 Del.C. § 4209. After reviewing the record, we find no error. Accordingly, we AFFIRM the sentence of death imposed by the Superior Court.

### Facts

It is not controverted that on April 10, 1992, Dwayne Weeks and Arthur Govan shot and killed Weeks' estranged wife, Gwendolyn Weeks, and her companion, Craig Williams.

From the testimony adduced during the sentencing hearing, it appears that the killings occurred following eight difficult years of marriage, during which Weeks subjected Gwendolyn to possessiveness, irresponsible behavior, and abuse. Gwendolyn had supported Weeks through years of drug abuse, emotional distress, and criminal behavior. In September of 1991, Gwendolyn left Weeks and moved to an apartment selected primarily for the safety that it would afford her from him.

A few weeks before her murder, Gwendolyn spoke with an attorney about obtaining a divorce. Divorce proceedings, however, were not initiated and she did not make any financial demands on Weeks. During this period, Weeks approached Gwendolyn to gain her cooperation in refinancing the mortgage on the house owned jointly by them. On advice of counsel, she refused.

Two days before the murders occurred Weeks spoke with Arthur Govan ("Govan"), a co-worker in Weeks' father's construction business. According to the testimony by Govan at Weeks' penalty hearing, Weeks explained to Govan that his wife was going to seek a divorce, and that he was "not going to let her get none of what he worked hard for." He offered Govan $500 for his assistance with the murder, payable either as $500 cash, or $250 cash and a gun. According to Govan, Weeks' reason for hiring Govan was simple: "So when she get killed, if the police would come to the house and put [Weeks] on a lie detector machine he would pass it … it would show he didn't have nothing to do with it … [h]e wouldn't be nervous."

The plan began to unfold on Friday, April 10, 1992. Shortly after work, Weeks drove Govan to Saint Francis Hospital in Wilmington, where Gwendolyn worked. He planned to show Govan where Gwendolyn parked and the door she used when leaving work. Govan testified that they would have shot Gwendolyn immediately if they had encountered her. However, they did not see her and both men left.

Later that same day, between 5:30 p.m. and 6:00 p.m., Weeks picked up Govan at his home in Chester, Pennsylvania. During his direct examination at Weeks' penalty hearing, Govan stated that when Weeks picked him up, "his eyes was real big, like you know, he was high or something." The two men drove to Saint Francis Hospital. However, they were unable to find Gwendolyn's car. Weeks then called an acquaintance who also worked at Saint Francis. He learned that Gwendolyn was not at work and that she was probably at home with her new boyfriend.

Weeks and Govan then drove to Gwendolyn's apartment. They parked at a neighboring church parking lot to avoid the security

gate barring the entrance to the apartment. Govan testified that while walking to the apartment, Weeks told him that if Craig Williams was present, "[h]e [Williams] going to get the same thing she get." Weeks was armed with a .380 automatic pistol and a .32 revolver that he gave to Govan. To avoid arousing Gwendolyn's suspicions, Weeks sent Govan to knock on the door. She did not respond and Weeks began to break down the door.

Gwendolyn telephoned 911 for assistance. The telephone line to the 911 dispatcher remained open throughout the incident and the entire episode was recorded on tape.

Upon gaining entry to the apartment, Weeks and Govan found Gwendolyn and Craig Williams huddled on the bedroom floor. Gwendolyn was shot twice. One bullet from the .380 automatic pistol wielded by Weeks entered her head, killing her instantly. Williams sustained several bullet wounds to his right hand and upper extremity. The medical examiner testified that these wounds were received when Williams raised his right arm to ward off the shots. He also suffered three wounds to the head. The last one was instantly fatal. A total of ten shots were fired in the apartment, four from the .380 automatic pistol wielded by Weeks, and six from the .32 revolver.

Leaving the apartment, Weeks took Gwendolyn's purse in order to make the killings appear to have been motivated by a robbery. Weeks seemed satisfied with the crime, as Govan noted in his testimony at the penalty hearing:

> He got in the car and told me that they dead, man. I know they dead. I seen meat and everything hanging out of their head ... I got her like I wanted to get her. I got her good. I got both of them good, you know.

Weeks placed both guns in Gwendolyn's purse, which he threw into a truck at his father's construction lot. He then dropped Govan off at the train station and went to his girlfriend's home. Weeks hoped that his girlfriend might be able to provide him with alibi. Police apprehended Weeks less than one hour after the killing.

Following consultation with counsel and after a lengthy plea colloquy, Weeks entered pleas of guilty to two counts of first-degree murder. Govan also initially confessed to his role in the murders and testified against Weeks at Weeks' penalty hearing. Govan was convicted of the intentional murder of Craig Williams and the felony murder of Gwendolyn Weeks. He received a sentence of life imprisonment that has been affirmed on appeal. *Govan v. State*, Del.Supr., 655 A.2d 307 (1995) (ORDER).

### Guilty Pleas
### *Knowing and Involuntary*

Weeks claims that, during the plea colloquy when he entered his plea of guilty to two counts of first degree murder, the Superior Court failed to ask him about the results of a recent psychiatric examination. He contends that because of this omission his guilty plea was not made knowingly and voluntarily. We agree with the Superior Court's finding that Weeks' guilty plea was both knowing and voluntary.

This Court noted in *Webster v. State*, that the "failure of a trial court to ascertain whether a plea of guilty has been entered knowingly and voluntarily is a concern of constitutional implication." *Webster v. State*, Del.Supr., 604 A.2d 1364, 1366 (1992) (citing *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969)).

This Court has stated that "it is well-established that a sufficient basis for the entry of guilty plea must appear on the record to permit appellate review of a subsequent challenge." *Sullivan v. State*, Del. Supr., 636 A.2d 931, 937 (1994) (citing *Fromal v. State*, Del.Supr., 399 A.2d 529 (1979). Before accepting a guilty plea, the trial court must engage the defendant in a series of questions in open court in order to determine the voluntariness of the plea. This plea colloquy must be preserved on the record and the judge must determine that the defendant realizes and understands the nature of the charges and the various penalties provided for that offense. *Id.*, 636 A.2d at 937. "The record must reflect that the defendant understands that the guilty plea constitutes a

waiver of a trial on the charges and the various constitutional rights to which he would have been entitled had he gone to trial." *Id.;* Super.Ct.Crim.R. 11(c). In addition, the trial court may not accept the guilty plea without first determining, by addressing the defendant in open court, that the plea is voluntary and not the result of threats, force, or promises apart from the plea agreement. Super.Ct.Crim.R. 11(d). *See Howard v. State,* Del.Supr., 458 A.2d 1180, 1184–85 (1983).

■■ Weeks cites no authority for his assertion that a trial judge must always inquire into a defendant's mental competency. The United States Supreme Court recently reiterated that "a competency determination is necessary only where a court has reason to doubt the defendant's competence." *Godinez v. Moran,* — U.S. —, — n. 13, 113 S.Ct. 2680, 2688 n. 13, 125 L.Ed.2d 321, 333 n. 13 (1993). Thus, a decision to plead guilty does not mandate a competency determination. *Id.* A trial judge, however, "must defer acceptance of a defendant's guilty ... plea whenever he has a reasonable ground to doubt the defendant's competence," and in such cases "must put into motion the process whereby the defendant's mental condition may be inquired into and determined." Wayne R. LeFave & Jerold H. Israel, *Criminal Procedure,* § 20.4 at 640 (1984). Similarly, additional inquiry into a defendant's competence to plead guilty is necessary "once the court has been informed that the defendant has recently ingested drugs or other substances capable of impairing his ability to make a knowing and intelligent waiver of his constitutional rights." *United States v. Cole,* 3d Cir., 813 F.2d 43, 46 (1987).[1] Defendant cites no authority, nor have we found any, suggesting that a trial court must question a defendant as to the result of a psychiatric examination where the court is given no reason to doubt the defendant's competence.

■■ The legal standard for competency to plead guilty is identical to the competency standard for standing trial. *Godinez,* —

U.S. at —, 113 S.Ct. at 2688, 125 L.Ed.2d at 133 (1993). A defendant's competence is predicated on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). The facts show that the Superior Court had no reason to doubt the competency of Weeks. His counsel, relying upon an evaluation by a psychiatric expert, assured the judge during the plea colloquy that his client was competent. The psychiatrist had determined that "[o]n the basis of [his] examination, [he did] not believe with reasonable medical certainty that Dwayne Weeks suffers from a psychiatric disorder." The trial judge received further assurance from Weeks himself that his prior commitments to mental institutions were for chemical dependency treatment. Moreover, Weeks makes no claim in this appeal that he suffered from a mental condition that would have rendered his plea involuntary. There is, therefore, *nothing in this record that causes us to doubt* that Weeks' guilty plea was entered knowingly and voluntarily.

### Death Penalty
### Statutorily Mandated Review

Under 11 Del.C. § 4209(g)(2), this Court must review a death penalty sentence to determine whether the evidence supports the Superior Court's finding of the existence of a statutory aggravating circumstance; whether the death sentence was arbitrarily or capriciously imposed or recommended; and whether the death penalty imposed was disproportionate to the penalty recommended or imposed in similar cases. The procedure to be followed by this Court in conducting its review is set forth in *Lawrie v. State,* Del. Supr., 643 A.2d 1336, at 1342–43 (1994) and *Sullivan v. State,* Del.Supr., 636 A.2d 931, at 948, 949 (1994).

11 Del.C. § 4209(g)(2) states:

---

1. *Cf.* MAINE R.CRIM.P. 11 (trial court has the duty to make inquiries as to competence to enter guilty plea if it learns from observation or a credible source that there is genuine doubt as to competence; court is otherwise entitled to rely upon defense counsel to bring to its attention any question as to defendant's competence).

(g) *Automatic review of death penalty by Delaware Supreme Court.*

(2) The Supreme Court shall limit its review under this Section to the recommendation on and imposition of the penalty of death and shall determine

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

(4) With regard to review of the sentence in accordance with this subsection, the Court shall:

a. Affirm the sentence of death.

b. Set aside the sentence of death and remand for correction of any errors during the hearing and for imposition of the appropriate penalty. Such errors shall not affect the determination of guilt and shall not preclude the reimposition of death where appropriately determined after a new hearing on punishment.

c. Set forth its findings as to the reasons for its actions.

### Death Penalty
### Aggravating Circumstances

■ In the Superior Court, three statutory aggravating circumstances were found to exist. *State v. Dwayne Weeks,* Del.Super., No. 92–01–0163 (Sept. 7, 1993) ("Sentencing Decision"). First, both murders were committed during the commission of a burglary. 11 Del.C. § 4209(e)(1)j. The occurrence of a burglary was proven beyond reasonable doubt through Weeks' guilty plea to the felony murder of Craig Williams where the predicate offense was burglary. Weeks conceded this aggravating factor also applied to his murder of Gwendolyn Weeks.

■ Second, Weeks' conduct resulted in the deaths of two people—Gwendolyn Weeks and Craig Williams. 11 Del.C. § 4209(e)(1)k. This also is established as a matter of law through Weeks' guilty pleas.

■ Finally, under 11 Del.C. § 4209(e)(1)h, it is a statutory aggravating factor that Weeks "paid ... or had agreed to pay" Govan "for the killing of the victim." This last aggravating factor was considered only as to the murder of Gwendolyn Weeks. Eleven of twelve jurors found this circumstance to exist, as did the Superior Court, based primarily on Govan's testimony.

We therefore find that the Superior Court's finding of three statutory aggravating circumstances was not erroneous.

### Death Penalty
### Not Arbitrary or Capricious

In its lengthy Sentencing Decision, the Superior Court carefully considered the totality of the evidence in aggravation and mitigation. 11 Del.C. § 4209(g)(2)a. Although Weeks claims that legal errors occurred in his sentencing process, the record clearly shows that the only error that occurred could not have prejudiced him.

Weeks notes that the Superior Court placed an additional burden on the State to prove the non-statutory aggravating circumstances beyond a reasonable doubt. We recently held that 11 Del.C. § 4209, does not require the State to present evidence establishing a non-statutory aggravating circumstance beyond reasonable doubt before it may be found to exist. *Dawson v. State,* Del.Supr., 637 A.2d 57, 64 (1994). The sentencing hearing here, however, pre-dated our holding in *Dawson* by over five months. The error, however, inured to Weeks' benefit.

■ Weeks also claims error on the ground that the Superior Court found that he was required to show the existence of mitigating circumstances by a preponderance of the evidence. Even if this was erroneous, Weeks cannot now complain because he earlier acquiesced to this burden.

In any case, the Superior Court's ruling was not erroneous. The U.S. Supreme Court has stated:

So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case, to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances [by a preponderance of the evidence].

*Walton v. Arizona,* 497 U.S. 639, 650, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511, 526 (1990) (plurality opinion). The Superior Court, in its Sentencing Decision, adopted the reasoning and holding of *Walton* by imposing on Weeks the preponderance of evidence burden. Weeks acquiesced in this ruling. Weeks cannot, and does not, claim in this appeal that the Superior Court's adoption of *Walton* or its careful balancing of the aggravating and mitigating factors, fell short of being "the product of a deliberate, rational, and logical deductive process." *Lawrie v. State,* 643 A.2d at 1344.

■ The Superior Court in its Sentencing Decision carefully weighed the aggravating circumstances which it found to exist against the mitigating circumstances that it also found to exist and determined that the aggravating circumstances outweighed the mitigating circumstances. We agree.

We conclude, therefore, that the Superior Court's decision to impose the death sentence was "the product of a deliberate, rational, and logical deductive process." *Red Dog v. State,* Del.Supr., 616 A.2d 298, 310 (1992) (citing *Pennell v. State,* Del.Supr., 604 A.2d 1368, 1376 (1992).) After carefully reviewing the entire record, we find that the sentence of death was not imposed upon Weeks by the Superior Court either arbitrarily or capriciously. 11 Del.C. § 4209(g)(2)a.

### Death Penalty Proportionality Review

Weeks also argues that his sentence of death is disproportionate when compared to other similar cases. 11 Del.C. § 4209(g)(2)a.

Specifically, he claims that this Court, in conducting its proportionality review, must give due consideration to death penalty cases decided both before the 1991 amendment to Section 4209 and the cases that arose after the amendment, in order to give full consideration to the "universe of cases" applicable.

Although the first degree murder cases that arose before the 1991 amendment of section 4209 are not part of the precise universe that the Court must consider in a proportionality analysis, they are pertinent to a proportionality review. We recently pointed out the difference between cases that arose under 11 Del.C. § 4209 as it existed before its amendment became effective on November 4, 1991 and those cases that arose after that date:

"The [proportionality] analysis here is substantially similar to that performed in *Outten v. State* [Del.Supr., 650 A.2d 1291, Nos. 159 & 163, 1993 (Consolidated), Veasey, C.J. (Nov. 21, 1994; revised Dec. 23, 1994)] and *Shelton v. State* [Del.Supr., 650 A.2d 1291, Nos. 164 & 166, 1993 (Consolidated), Veasey, C.J. (Nov. 21, 1994; revised Dec. 23, 1994)]. Title 11 Del.C. § 4209(g)(2)a requires that there be some proportionality between the crime committed and the blameworthiness of the defendant and mandates that the Supreme Court determine:

Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

In making this determination, this Court will scrutinize those first degree murder cases governed by the 1991 amendment to the death penalty statute which have continued to a penalty hearing and where the sentence has become final. In addition, the Court may consider those cases decided under the law in effect from 1985 to 1991 which the Court deems pertinent to

the case before it. *Wright v. State*, Del. Supr., 633 A.2d 329, 342 (1993).

In view of this Court's decision in *Lawrie*, 643 A.2d at 1350, it is essential to distinguish between those cases governed by 11 Del.C. § 4209 as it existed before the 1991 amendment which became effective on November 4, 1991, 68 Del.Laws, Ch. 189 (the "pre–1991 cases"), and those cases governed by the current provisions of Section 4209 after November 4, 1991 (the "post–1991 cases"). In *Lawrie*, we held that the changes in the statutory scheme in 1991 created such a "significant dissimilarity between the pre–1991 cases and the post–1991 cases" that the former are merely "pertinent" but are "clearly distinguishable" because of the statutory change. 643 A.2d at 1350. The pre–1991 cases required a unanimous jury verdict to impose the death penalty. In the post–1991 cases, it is the trial judge who has the final responsibility for sentencing, and the jury's recommendation need not be unanimous. As a result, we held that the pre–1991 cases "are not 'similar cases arising under this section' [4209]. Thus, while pertinent, they are not dispositive...." *Id.* Further, we held in *Lawrie* that the particular pre–1991 cases being offered there as pertinent were not "significantly persuasive on the proportionality issue." *Id.*

Thus, the teaching of *Lawrie* is that this Court must scrutinize the post–1991 cases as the precise universe which is directly applicable to the statutorily-mandated proportionality analysis. While in a given situation a pre–1991 case may be pertinent, and thus may be considered, in the usual case it would not likely be "significantly persuasive." *Nelson Walter Shelton v. State*, Del.Supr., 652 A.2d 1 (1995) (footnotes omitted).

In this appeal Weeks cited three cases that arose before the 1991 amendment: the companion cases of *Chao v. State*, Del.Supr., 604 A.2d 1351 (1992); and *Liu v. State*, Del. Supr., 628 A.2d 1376 (1993), and *Williams v. State*, Del.Supr., No. 273, 1990, Horsey, J., 1992 WL 115943 (April 21, 1992) (ORDER). Weeks claims that because death sentences were not imposed in *Chao, Liu,* or *Williams,* the sentence of death imposed upon him is disproportionate as to the sentences imposed on other defendants for similar crimes. We disagree.

█ The task of the Court in conducting a proportionality review is to determine whether, "considering the totality of the evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender," the sentence of death is "disproportionate to the penalty recommended or imposed in similar cases." 11 Del.C. 4209(g)(2)a. *See also Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1342–43 (1994).

The cases, such as *Chao, Liu,* and *Williams,* that arose under Section 4209 before the 1991 amendment, are not part of the precise universe of cases that must be considered in reviewing Weeks' penalty but may be considered pertinent. If considered, they are less persuasive than the cases that have risen since the 1991 amendment because the unanimous concurrence of the jury was required for a death sentence prior to 1991. *Nelson Walter Shelton v. State*, 652 A.2d 1 (1995).

Just because juries, in three isolated cases decided before the 1991 amendment to section 4209, did not unanimously recommend the death penalty, it doesn't follow that the sentence of death received by Weeks is disproportionate to the sentences imposed in other similar cases under section 4209.

While "definite comparison of the universe of cases is almost impossible," this Court examines the factual background of the relevant cases to determine whether the death sentence is proportional. *Pennell,* 604 A.2d at 1376–77.

█ After reviewing *Chao, Liu,* and *Williams* and the cases that have arisen before and after the 1991 amendment to 11 Del.C. § 4209 (including those in which the death penalty was not imposed), we conclude that the sentence of death imposed on Weeks

is not disproportionate to the sentence imposed in other similar cases.[2]

Gwendolyn Weeks and Craig Williams were shot to death while huddled on the bedroom floor and while on the telephone speaking to the 911 dispatcher. The murder of Gwendolyn Weeks did not result from a sudden impulse of anger or outburst of rage. Rather, Weeks plotted the death of his wife at least two days in advance and proceeded to kill her and her companion while they were helpless in a cold-blooded, calculated execution-style manner. As did Steven Pennell, Weeks "took with him the tools necessary to ... kill." *Pennell*, 604 A.2d at 1374. Weeks hired an accomplice and took two pistols with him. He determined in advance where he would confront his wife for the last time, and "cased" that area. He was undaunted when his wife failed to turn up as he planned at her place of employment. He then decided to go to her residence. Nor did Weeks abandon the crime when he learned that his wife was not alone. Rather, he decided that his wife's companion would die also. In carrying out his plot, Weeks exhibited the doggedness that characterized the murders in *Sullivan*, 636 A.2d at 935 and *Gattis v. State*, Del.Supr., 637 A.2d 808, 811 (1994).

Weeks, like numerous other defendants sentenced to death in Delaware, was found guilty of killing multiple victims. *Cf. Lawrie*, 643 A.2d at 1340; *Pennell*, 604 A.2d at 1374; *see also Deputy v. State*, Del.Supr., 500 A.2d 581, 602 (1985); *Bailey v. State*, Del.Supr., 490 A.2d 158, 173 (1983) and *Bailey v. State*, Del.Supr., 503 A.2d 1210, 1211 (1984); *Flamer v. State*, Del.Supr., 490 A.2d 104, 123–24 (1984).

As has often been the case in murders leading to the death penalty, Weeks' crime involved the invasion of his victim's residence. *Lawrie*, 643 A.2d at 1340; *Gattis*, 637 A.2d at 811; *Dawson*, 637 A.2d at 59; *Red Dog*, 616 A.2d at 300–02; *see also Deputy*, 500 A.2d at 585. Similarly, this Court has

noted that "[t]he deliberate, cold-blooded killing, in execution style, of a helpless spouse or lover is deserving of society's harshest condemnation." *Gattis*, 637 A.2d at 823.

Immediately following the killing, Weeks showed no remorse. *Cf. Nelson Walter Shelton v. State*, Del.Supr., 652 A.2d 1 (1995); *Shelton & Outten v. State*, 650 A.2d 1291 (Del.Supr.1994); *Sullivan*, 636 A.2d at 936, *Red Dog*, 616 A.2d at 300–02. Instead, he sought to prevent detection of his involvement in the killing.

Although the state claimed that the death of Gwendolyn Weeks precluded the financial loss that Weeks believed he would experience from his wife's impending divorce action, and the evidence indicated that was the case, the Superior Court did not find that pecuniary gain existed as an aggravating circumstance under 11 Del.C. § 4209(e)(1); Sentencing Decision at 9–10. The presence of pecuniary gain is not necessary, however, for a death sentence to be affirmed. *Lawrie*, 643 A.2d at 1349.

On numerous occasions, this Court has affirmed the death penalty where the killing was an unprovoked, cold-blooded murder of a helpless person who lacked the ability to defend himself. *Nelson Walter Shelton v. State*, 652 A.2d 1 (1995); *Outten & Shelton; Lawrie v. State*, Del.Supr., 643 A.2d 1336 (1994); *Ferguson v. State*, Del.Supr., 642 A.2d 772 (1994); *Gattis v. State*, Del.Supr., 637 A.2d 808 (1994); *Dawson v. State*, Del.Supr., 637 A.2d 57 (1994); *Sullivan v. State*, Del.Supr., 636 A.2d 931 (1994); *Wright v. State*, Del.Supr., 633 A.2d 329 (1993); *Red Dog v. State*, Del.Supr., 616 A.2d 298 (1992); *Pennell v. State*, Del.Supr., 604 A.2d 1368 (1992).

In conducting the proportionality review, we have also reviewed the sentencing determinations in the 13 cases since the 1991 amendment to Section 4209 where the defendant received the sentence of life imprisonment rather than death.[3] After carefully

---

2. The cases consisting of the precise universe in our proportionality review are as set forth in *Nelson Walter Shelton v. State*, with the addition of that case. We also considered *State v. Clark*, Del.Super., Cr.A. Nos. IN94–06–0543 through 0548, Barron, J., 1995 WL 44582 (Jan. 5, 1995), *app. pend.*, Del.Supr., No. 019, 1995.

3. *See* Trial Judges' Reports for the following cases (on file with the Court Administrator): *State v. Reginald N. Sanders*, Del.Super. No.

comparing the facts in this case with the facts in those cases where the death penalty has been imposed and in those in which it has not, we are convinced that the Superior Court properly imposed the sentence of death on Dwayne Weeks and the sentence is not arbitrary or capricious, and is fair and appropriate.

We also find, therefore, that the murders committed by Dwayne Weeks fit the pattern of other cases in which the death penalty has been imposed and that the sentence of death upon Weeks is not disproportionate with sentences received by other defendants for similar cases. 11 Del.C. § 4209(g)(2)a.

### Conclusion

This Court has examined the entire record and has appraised and rejected all claims of error. We find that the death sentence is fair and is proportional to previous sentences imposed in similar cases arising under 11 Del.C. § 4209. The judgment, therefore, of the Superior Court sentencing Dwayne Weeks to death for the murder of Gwendolyn Weeks and Craig Williams is AFFIRMED. This matter is REMANDED to Superior Court for further proceedings in accordance with this opinion. This Court's Order of September 30, 1993, staying the execution of Weeks' death sentence shall terminate upon the issuance of this Court's mandate. The Clerk of the Court is directed to cause a copy of this opinion to be hand-delivered forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

IK86–03–0898, 0899, 0903, July 28, 1992; *State v. Meri Ya C. Baker,* Del.Super. No. IN90–12–1039, 1040, Sept. 30, 1992; *State v. Charles M. Cohen,* Del.Super. No. IN90–02–0474 thru 0477, Aug. 7, 1992; *State v. Byron S. Dickerson,* Del.Super. No. IN90–12–1041, 1042, Sept. 30, 1992; *State v. Donald J. Simmons,* Del.Super. No. IN92–01–0770 thru 0772, IN92–01–1140 and 1141, Jan. 4, 1993; *State v. Arthur Govan,* Del.Super. No. 92–01–0166, Oct. 14, 1993; *State v. Frank W. Moore, Jr.,* Del.Super. No. 92–09–0001, 0002, 1001, 2001, 3001, July 11, 1993; *State v. Robert W. Jackson, III,* Del.Super. No. IN92–04–1222 thru 1227, IN92–04–1348, 1349, May 7, 1993; *State v. James W. Perez,* Del.Super. No. IN–93–02–1191/1197, Oct. 25, 1993; *State v. Jose Rodriguez,* Del.Super. No. IN–93–020–1131, Dec. 3, 1993; *State v. Charles H. Trowbridge,* Del.Super. No. IK–91–07–0175, IK–91–09–0032 thru 0034 (Dec. 9, 1992); *State v. John E. Watson,* Del.Super. No. IN–91–09–0020 thru 0025, Oct. 18, 1994; *State v. Williamson,* Del.Super. No. S93–05–0249 thru 0255, S93–05–1249, S93–05–2249, Oct. 18, 1994.