Adam NORCROSS, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Nos. 510,2001, 551,2001.

Supreme Court of Delaware.

Submitted: Oct. 8, 2002.
Decided: Feb. 5, 2003.
Revised: Feb. 6, 2003.

---

Bernard J. O'Donnell (argued), and Nicole M. Walker, Office of the Public Defender, Wilmington, for Appellant.

John R. Williams (argued), Department of Justice, Dover, Loren C. Meyers, Department of Justice, Wilmington, and Kim E. Ayvazian, Department of Justice, Georgetown, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

BERGER, Justice:

This is Adam Norcross's direct appeal from his convictions for the murder of Kenneth Warren. Norcross contends that the trial court erred in several evidentiary rulings, including its denial of his motion to suppress the statement he gave to the police. He also argues that the victim impact evidence and the State's closing argument unfairly prejudiced him at the penalty hearing. Finally, Norcross challenges the constitutionality of the Delaware death penalty statute. After carefully reviewing the record and considering his claims, we are satisfied that the trial court acted within its discretion in ruling on the evidence and that Norcross received a fair trial. We also hold that the 1991 Delaware death penalty statute, as applied to Norcross, is constitutional. Finally, having reviewed the facts and circumstances of this crime and this criminal as mandated by statute, we conclude that the imposition of the death sentence is proportionate. Accordingly, we affirm.

Factual and Procedural Background

Shortly after 8 p.m. on November 4, 1996, the Warren family was settling in for the night in their Kenton, Delaware home. Kenneth Warren was sitting at the kitchen bar eating a sandwich, while his wife, Tina, and their 19–month–old son, Dustin, were sitting on the family room couch watching television. Tina's mother, Lillian, had just left, after babysitting Dustin while Tina was at an aerobics class. Suddenly, two armed, masked men burst through the glass patio doors leading to the family room. They immediately ran into Kenneth and a struggle ensued. The intruders shot Kenneth four times, killing him, while his wife and son watched. They then grabbed Tina's purse, which was on the kitchen counter, and fled.

Although the police found Tina's purse shortly after the murder, they were unable to develop any leads as to the identity of the killers. In December 1999, however, Bridgette Phillips sent an e-mail that led to the arrest of Norcross and his co-defendant, Ralph Swan. Phillips was married to Norcross in 1997, when she overheard a conversation between Norcross and Swan about their involvement in a shooting. Norcross later explained to Phillips that he and Swan had planned to rob an empty home, but had found it occupied and that Swan was shot in the shoulder, so Norcross had to kill the homeowner. Norcross also told Phillips that they would never be caught because they had worn masks.

The police arrested Norcross on February 9, 2000, and he gave a statement the following day. Norcross admitted that he was present during the incident, but said that Swan was the one who killed Warren. Norcross claimed that Swan started shooting, but that Norcross's gun would not fire. Swan grabbed Norcross's gun, cleared it, and then used it to shoot Warren in the head. After the two men started running

to Swan's car, Swan told Norcross that he wanted to go back and kill the woman because she was a witness. Norcross stopped him by shooting Swan in the shoulder. The two men, who both worked at the Eastern Shore Concrete Company in Middletown, disposed of Tina's purse and their weapons the next day.

Norcross told slightly different stories to others. Matthew Howell worked at the concrete company with Norcross and testified that, a few weeks before the murder, Norcross asked him whether he wanted to join Norcross in a robbery. Howell declined. Several weeks later, Norcross told Howell that he and Swan had gone to a house to commit a robbery and that it "went bad." Norcross explained that as they broke into the house, a man inside fired at them, and they returned fire. In this version, Norcross said that he shot Warren in the head and that Swan was hit in the shoulder either by the homeowner or crossfire. Norcross told all this to Howell because he claimed not to trust Swan, and wanted someone to know what happened. Howell did not report this information to the police because Norcross threatened to kill him.

Norcross also told his then-girlfriend, Gina Ruberto, about the murder. Ruberto testified that Norcross was upset one night and showed her a newspaper article about a murder and robbery. Norcross started crying and told Ruberto that he and Swan broke into someone's house in Kenton, Delaware, and that the man inside pulled a gun on him. Norcross responded by trying to shoot the man, but his gun jammed, so Swan shot the man. Norcross said that he shot Swan in the shoulder during the confusion. He also told Ruberto that they burned the fatigues they had been wearing during the incident and that he threw his gun into the water. Finally, Norcross told

Ruberto that no one was supposed to get hurt.

## Discussion

### A. The Admissibility of Norcross's Statement

Norcross first argues that the trial court erred in denying his motion to suppress the statement he gave to the police. Norcross contends that his statement was improperly coerced, and thus involuntary. Specifically, Norcross argues that the police manipulated Norcross's fear of physical harm and pressured him to talk, when his many periods of silence during the interrogation indicated that Norcross did not want to talk. In addition, even if the initial interrogation was proper, Norcross argues that he invoked his right to remain silent during the interrogation by asking to hear what Swan had said in his interrogation.

▮▮▮▮▮▮ We review the Superior Court's decision denying the motion to suppress for abuse of discretion.[1] A suspect who is being subjected to a custodial interrogation has a Fifth Amendment right to remain silent and must be clearly informed of this and related rights before an interrogation begins.[2] The suspect may waive his/her rights. To be valid, however, the waiver must be knowing, voluntary and intelligent.[3] Based on the totality of the circumstances, the court must be satisfied that the waiver was "the product of a free and deliberate choice rather than intimidation, coercion or deception."[4] In other words, "[t]he question in each case is whether the defendant's will was over-

borne by official coercion when a statement was made."[5] Finally, under the Delaware constitution, if a suspect attempts to invoke *Miranda* rights during an interrogation, but does not do so unequivocally, the police must clarify the suspect's intention before continuing with the interrogation.[6]

▮▮▮▮ Norcross points to several aspects of the interrogation that, he claims, were coercive. First, Norcross repeatedly remained silent after being asked a question, but the police kept pushing him to talk, telling him that it would be in his best interest to set the record straight. Second, the police lied to Norcross, telling him that Swan had confessed and made Norcross sound like the aggressor. In fact, Swan had refused to speak to the police. Finally, Norcross claims that the police "manipulated" his fear of Swan to obtain a confession. This evidence, according to Norcross, demonstrates that his statement was not voluntary.

We find no basis in the record to overturn the trial court's determination that Norcross's statement was voluntary. The Superior Court noted that it was a "high-pressure" interview, but concluded that Norcross's will was not overborne. The trial court found that: (i) Norcross "clearly understood" his right to stop talking any time he wished; (ii) in telling Norcross that he "had" to tell them what happened, the police officers were only "saying that if you want us to consider your story, you have to tell us your story . . . ."; and (iii) the officers agreed to keep Norcross and

1. *Virdin v. State*, 780 A.2d 1024, 1030 (Del. 2001).

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

4. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (defining the voluntariness test).

5. *Marine v. State*, 607 A.2d 1185, 1197 (1992) (internal quotations and citations omitted).

6. *Draper v. State*, No. 147, 2000, Berger, J. (Del. Jan. 28, 2002) (unpublished opinion).

Swan separated as soon as Norcross expressed concern for his safety, and did not use his fear of Swan to coerce Norcross's confession. Based on these findings, which are supported by the record, we conclude that the trial court acted within its discretion in deciding that the statement was voluntary.

█ Norcross raises an additional *Miranda* issue on appeal, based on the recent decision in *Draper v. State*.[7] In *Draper*, the defendant repeatedly told the interrogating officer that he wanted to talk to his mother before talking to the police. This Court held that Draper's statement constituted an ambiguous invocation of his right to remain silent, requiring the police to clarify Draper's intent before proceeding with the interrogation. Norcross argues that, by asking to hear what Swan had told the police, he equivocally invoked his right to remain silent.

We find no merit to this argument. Norcross told the police, "I want to know what Swan said." He was told, in response, "We're not gonna sit here and tell you everything that Swan said." A moment later, Norcross asked if he could hear the tape of Swan's statement. Again, he was told he could not. This brief colloquy cannot be interpreted as an ambiguous invocation of the right to remain silent. At no point did Norcross say that he did not want to continue the interrogation, or that he wanted to hear Swan's statement before answering any additional questions. Accordingly, *Draper* is not applicable.

### B. The Admissibility of the Transcriptions

The State placed in evidence a videotape of Norcross's statement to the police and audiotapes of Tina's 911 call on the night of the murder, as well as her statements to the police. Because the quality of those tapes was poor, the State also offered in evidence transcriptions of each tape, which had been merged with the original recordings on digital video discs (DVDs). The trial court listened to the original tapes, found that they were inaudible in spots, and concluded that the transcripts would be a useful listening aid. The court admitted the DVDs, which permitted the jury to listen to the tapes while viewing the transcription. After the evidence was presented, the court instructed the jury that the actual recordings, not the transcripts, were the best evidence.

█ Norcross does not dispute the accuracy of the transcriptions, but argues that the manner in which they were presented to the jury "placed improper emphasis on their value." The process of placing the transcriptions and the original tapes on DVDs reduced the already imperfect audio quality of the original tapes. As a result, when the DVDs were played, the jury had to rely primarily on the transcriptions, because the tapes were difficult to understand. Under these circumstances, Norcross contends that the transcriptions became much more than just listening aids. Norcross argues that, in order to prevent improper emphasis on the transcriptions, the only "listening aid" should have been paper transcriptions, which should not have been admitted into evidence.

In *Atkins v. State*,[8] this Court discussed the factors that a trial court should consider in exercising its discretion as to the use of transcriptions:

> When original tape recordings are properly introduced into evidence, transcriptions of those recordings *may* also be received into evidence with the exer-

7. No. 147, 2000, Berger, J. (Del. Jan. 28, 2002).

8. 523 A.2d 539, 544–45 (Del.1987).

cise of judicial discretion. . . . Initially, the Court must satisfy itself that the transcripts are accurate. . . .

The Court may also properly exercise its discretion in deciding how, if at all, the transcripts are to be used. We note that the use of accurate transcripts as a listening aid may often be helpful to jurors if the tape recording is long or difficult to hear. A court may permit the jury to retain the transcripts during the trial and their deliberations. However, the probative value of the retention of the transcripts during trial and during deliberations should be weighed against the normal prohibitions on cumulative evidence and improper emphasis.

If the transcripts are needed for any purpose, the jury must be carefully instructed concerning the use of the transcripts and must specifically be instructed that the tape recording and not the transcript is the evidence of the conversation.[9]

The Superior Court followed the process suggested in *Atkins*. It determined that the transcriptions were accurate based on the fact that neither side disputed their accuracy. The court then listened to the original tapes and found them to be inaudible in spots. As a result, the court determined that the transcriptions would be a useful listening aid for the jurors. Finally, the court properly instructed the jury that the recordings, not the transcriptions, were the best evidence of the statements. We find no abuse of discretion in the trial court's decision that the transcriptions could be presented in the form of DVDs and admitted into evidence.

## C. Cross–Examination on Voluntariness

Norcross next argues that the trial court committed reversible error by depriving him of his constitutional right to cross-examine witnesses. Norcross's counsel was cross-examining Officer Charles Brown, one of the officers who took Norcross's statement, when the Superior Court sustained the State's objection to one question:

Q. All right. And to that extent would you agree with me that police officers are not supposed to make promises to persons who are being questioned?

A. That's correct, not promises about charging and this type of thing.

Q. Basically not to make promises about anything because if they make a promise and that is relied on that can go to voluntariness, correct, sir?

A. That's correct.

Q. Sir, when Mr. Norcross was being questioned and he was making comments about guarantees, would you agree that it would have been more appropriate to say, Look Adam, if you don't talk to us, fine, but if you don't want to talk to us, we are not going to say anything.

A. Well, we—he asked for guarantees and we ultimately fulfilled those guarantees that we gave him about going to a separate prison.

Q. That is in terms of what we discussed with the officer, but in legal principle when he is talking about guarantees wouldn't it have been better to say, Look, we are not promising you anything?

Prosecutor: Objection. What is the relevance of this line of questioning?

The Court: Yeah. [Defense Counsel.]

Defense Counsel: Your Honor, it goes to the voluntariness.

The Court: Objection is sustained.

Although the court makes the initial determination whether a statement

---

9. *Id.* (emphasis in the original).

is voluntary, and thus admissible, the jury "may consider any claim of involuntariness as affecting the weight of the evidence." [10] In other words, "the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial." [11] Thus, a blanket exclusion of all evidence relating to the circumstances surrounding a defendant's confession deprives the defendant of his right to a fair trial. [12]

 Here, however, there was no deprivation of Norcross's constitutional rights. There was no blanket exclusion of relevant evidence. The trial court merely sustained an objection to one question that sought a police officer's legal opinion as to what might be a better way to conduct an interrogation. Norcross asked numerous other questions, without objection, touching on the reliability of the confession. In addition, the jury saw the entire videotaped confession. Thus, the police officers' "tactics" were fully revealed, giving Norcross the evidence he needed to argue that the confession should be disregarded.

### D. Victim Impact Evidence

During the penalty phase of this trial, Warren's relatives and friends testified about Warren's character and their enormous loss and pain. Norcross complains that this victim impact evidence was so emotional and so extensive that he was deprived of the right to a fair sentencing recommendation based on rational consideration of the aggravating and mitigating circumstances. [13] He notes that Warren's relatives spoke at length about him and about the permanent, devastating impact his murder has had on Warren's family. Several witnesses cried during their testimony and, more than once, the trial court expressed concern about the highly emotional tone of the proceedings.

 While we agree that the victim impact evidence was very emotional, we do not find that it was so unduly prejudicial as to render the penalty phase of the trial fundamentally unfair. We reach this conclusion, in part, based on our careful review of the witnesses' testimony. In addition, we give considerable weight to the trial court's assessment of the level of emotions during the victim impact testimony. The trial court was in the best position to evaluate (and control) the overall tone of the proceedings. The court said:

My concern yesterday and the day before was that some of [the testimony] was excessive and might have overwhelmed the other evidence, but I think it toned down and I'm satisfied with the state of the record on it.

\* \* \*

I'm hard-pressed to describe any of the witnesses as unemotional. I think they all displayed proper emotion. As I said, my concern was that if I didn't say something, the emotionality would continue to build and it may have—it might have affected the decision improperly, but I'm satisfied that the demeanor of the witnesses who testified, their emotionality, was appropriate and the jury

---

10. *Harris v. State,* 1993 WL 61667, \*2 (Del. 1993) (unpublished decision).

11. *Crane v. Kentucky,* 476 U.S. 683, 688, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (emphasis in the original).

12. *Id.* at 690, 106 S.Ct. 2142.

13. *See: Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)("In the majority of cases . . . victim impact evidence serves entirely legitimate purposes. In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.").

may consider that. I will not tell the jury not to.

Finally, we note that the court instructed the jury:

> You are reminded that you must base your answers to the questions set forth in the special interrogatory sheet solely upon the evidence and the instructions as to the applicable law. You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.
>
> While the evidence about the victim and about the impact of the murder on the victim's family is relevant to your decision, you must remember not to allow sympathy to influence your sentencing recommendation in any way.
>
> The Court does not charge you not to sympathize with the victim or his family or the defendant or his family because it is only natural and human to sympathize, but the Court does charge you not to allow sympathy to influence your sentencing recommendation.

Based on all of these factors, we accept the trial court's determination that the admittedly emotional victim impact testimony did not prevent the jury from performing its task properly.

### E. Prosecutor's Closing Statement

Norcross complains that, in closing arguments during the penalty phase of the trial, the prosecutor improperly encouraged the jury to compare the value of Warren's life with Norcross's, and improperly suggested that the jury would be doing its job and serving justice if it recommended the death penalty. For example, the prosecutor said:

The State came to court and advised you that we're looking for justice. Cheryl Vest, Kenny's sister, is seeking justice, as everybody in this courtroom is.

You are being asked to perform, obviously, a very important duty, and that is to render justice.

Martin Luther King once said, "If justice isn't for everyone, justice isn't for anyone."

Norcross objected, saying that the standard is not justice, it is whether the aggravating circumstances outweigh the mitigating circumstances. The trial court overruled the objection, saying, "The standard is justice as well."

We find nothing improper in the prosecutor's comments. During the penalty phase of the trial, the jury is being asked to consider all of the aggravating and mitigating circumstances and make a recommendation as to the appropriate sentence. In doing so, the jury may properly consider victim impact evidence and the prosecutor may "remind '[the jury] that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' "[14] There also is nothing improper in asking the jury to "do justice" in the penalty phase. Justice is done when the jury undertakes its responsibilities and reaches a decision based on the evidence presented. Norcross can argue that "justice" would be a life sentence. As long as the argument focuses the jury on the evidence, as the prosecutor did here, there is no prohibition on the use of the word "just" or "justice."[15]

**14.** *Red Dog v. State,* 616 A.2d 298, 310 (Del. 1992) (quoting *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).

**15.** *See Sullivan v. State,* 636 A.2d 931, 941 (Del.1994) (Where this Court upheld prosecutor's comment, "No one can beg for Maurice Dodd's life today....All we can do today, ladies and gentlemen, is impose a just sentence on Willie Sullivan."). *See also Domingues v. State,* 112 Nev. 683, 917 P.2d 1364, 1375 (1996) (Where court upheld prosecutor's comment, "Nothing cries for justice

## F. The Constitutionality of the Death Penalty Statute

Norcross argues that the recent United States Supreme Court decision in *Ring v. Arizona*[16] rendered unconstitutional the 1991 version of Delaware's death penalty statute, 11 *Del. C.* § 4209. *Brice v. State*,[17] decided after Norcross advanced these arguments, resolves this issue. In *Brice*, this Court addressed several questions concerning the 2002 amendment to § 4209, and held that *Ring* only extends to the so-called "narrowing" phase of the sentencing process. Thus, once a jury finds, unanimously and beyond a reasonable doubt, the existence of at least one statutory aggravating circumstance, the defendant becomes death eligible and *Ring's* constitutional requirement of jury fact-finding is satisfied.

In this case, Norcross was sentenced under the 1991 version of § 4209, which did not require the jury to find the existence of a statutory aggravator unanimously and beyond a reasonable doubt. But the jury did meet the *Brice* standard, since it convicted Norcross of, among other crimes, two counts of felony murder under 11 *Del.C.* § 636(a)(6), and a conviction under § 636(a)(2)—(7) establishes the existence of a statutory aggravator under § 4209(e)(2). In Brice, this Court held that § 4209(e)(2) satisfies *Ring*. Thus, we conclude that the 1991 version of § 4209 is constitutional as applied to Norcross.

## G. Automatic Review of Death Penalty

Pursuant to 11 *Del.C.* § 4209(g)(2), this Court conducts an independent review of any death sentence imposed by the Superior Court. The purpose of that review is to determine whether: i) the evidence supports the finding of at least one statutory aggravating circumstance; ii) the death penalty was imposed arbitrarily or capriciously; and iii) the sentence is disproportionate when compared to similar cases arising under the statute. This Court recognizes the importance of its statutory responsibility, inasmuch as "death as a punishment is unique in its severity and irrevocability."[18]

### 1. Statutory Aggravating Circumstances.

The State alleged that the applicable statutory aggravating circumstance in this case was that the murder was committed while Norcross was engaged in the crime of robbery first degree and burglary first degree.[19] As discussed above, the jury convicted Norcross of two counts of felony murder based on his having murdered Warren while in the course of committing robbery and burglary first degree, and Norcross does not argue that the evidence was insufficient to support the jury's verdicts. Nonetheless, the Court reviewed the evidence in order to make its own finding on this issue.

This was not a close case. There is no dispute about the fact that two masked intruders, wearing camouflage

---

like the voice of a murdered child."); *State v. Ramsey*, 864 S.W.2d 320 (Mo.1993) (Where court upheld prosecutor's explanation of reasons for the death penalty, "The first is that it is, by definition, a just punishment for those very rare, very rare people that commit this type of crime … it is a just punishment legally and morally.").

**16.** 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**17.** 815 A.2d 314 (Del.2003).

**18.** *Sullivan v. State*, 636 A.2d 931, 948 (Del.) *cert. denied*, 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994) (citations omitted).

**19.** 11 *Del.C.* § 4209(e)(1)(j).

clothing, broke into Warren's home at night; that they killed Warren; and that they took Tina's purse. That Norcross was one of those men was established by his statements to three witnesses as well as his statement to the police. Although there was conflicting evidence on the question of who fired the fatal shot, as the Superior Court noted, it does not matter. Norcross and Swan both were armed; both men were shooting; and Warren suffered four bullet wounds from two different guns. The Superior Court correctly concluded, "[t]he evidence leaves no doubt that both defendants were acting in concert with murderous intent when Warren was killed." We are satisfied that there was sufficient evidence to support the felony murder convictions.

### 2. Whether the Sentence was Arbitrary and Capricious

The Superior Court carefully considered a number of aggravating and mitigating circumstances in reaching its determination, consistent with the jury's 10–2 recommendation, to impose the death penalty. The mitigating circumstances included the fact that Norcross expressed remorse, both at trial and in his discussions with others prior to his arrest. In addition, Norcross endured a difficult childhood, marked by physical, emotional and sexual abuse. He does not know who is father is and his mother was uncaring. Despite that adversity, friends and acquaintances described Norcross as friendly, polite and helpful. Finally, Norcross was gainfully employed as an adult.

The aggravating circumstances are, as the trial court noted, "overwhelming." What happened on November 4, 1996, is every family's worst nightmare. Warren and his wife were in their home, relaxing together after a long day of work, enjoying time with their happy, active young son.

They did nothing to place themselves in jeopardy, like opening the door to a stranger. They had every reason to believe that they were safe. The fact that Warren was slaughtered in his own home in front of his wife and son is an aggravator of enormous importance.

The ruthlessness of this crime is compounded by the fact that Norcross saw the Warren family through the patio doors before he broke in. So Norcross knew he would be confronting Warren. Norcross had a gun, and could have demanded valuables if that was what he wanted. But Warren was given no chance to comply with any demands. He was attacked immediately and brutally murdered. Norcross may have told people that he did not mean to hurt anyone, but his actions belie such self-serving comments. Norcross told the police that he gets a "rush" from breaking and entering, and with friends he joked and bragged about the killing. This was not a robbery "gone bad." It was a vicious, unprovoked, random act of violence of the highest order.

Finally, the devastating impact of this murder on Warren's family and friends adds another significant aggravating circumstance. In almost any murder, there are loved ones left to grieve and try to get on with their lives. But in this murder, because Warren was so close to his extended family, the number of victims and the extent of their suffering is noteworthy. Also, because of the way that Warren was murdered, his loved ones have been permanently robbed of their sense of safety and security. The Warren family will never fully recover from this tragedy.

In sum, the Superior Court's decision to impose the death penalty was neither arbitrary nor capricious. The court found that the aggravating circumstances far out-

weighed the mitigating circumstances and that finding is amply supported by the record.

### 3. Proportionality Review.

■■■■■ The final aspect of this Court's statutory review is the determination of proportionality. The Court compares the "universe" of death penalty cases to this one to determine whether imposition of the death penalty in this case is proportionate.[20] In performing this task, the Court recognizes that a "definitive comparison of the 'universe' of cases is almost impossible."[21] "[S]entencing decisions involve difficult and uniquely human judgments that defy codification and that buil[d] discretion, equity and flexibility into a legal system."[22] "Recognizing these limitations, this Court looks to the factual background of relevant cases to determine the proportionality of the sentence imposed."[23]

■■■■ As with others sentenced to death, Norcross committed an unprovoked, cold-blooded execution of a defenseless victim, presumably for pecuniary gain.[24] In addition, Norcross invaded the victim's home to commit the murder, a factor that has resulted in the death penalty in other cases.[25] Finally, Norcross managed to escape detection and arrest for several years by burning his clothing, disposing of his gun, and threatening the lives of those people he had told about the killing. Similar conduct factored into the death sentences in *Capano v. State*[26] and *Weeks v. State*.[27] We are satisfied that, for proportionality purposes, this case is substantially similar to other post–1991 death penalty cases and, therefore, we conclude that the death sentence is not disproportional.

### Conclusion

After carefully reviewing the entire record, this Court concludes that the death sentence imposed on Norcross is appropriate under 11 *Del.C.* § 4209. Accordingly, the judgment of the Superior Court sentencing Norcross to death for the murder of Kenneth E. Warren is AFFIRMED. This matter is REMANDED to the Superior Court for further proceedings in accordance with this opinion.

---

20. Cases governed by the 1991 amendment to § 4209 are most persuasive, but earlier cases still may be considered. *Lawrie v. State*, 643 A.2d 1336, 1350 (Del.1994) *cert. denied*, 513 U.S. 1048, 115 S.Ct. 646, 130 L.Ed.2d 551 (1994).

21. *Pennell v. State*, 604 A.2d 1368, 1376 (Del. 1992).

22. *Wright v. State*, 633 A.2d 329, 342–343 (Del.1993) (internal quotations omitted.).

23. *Clark v. State*, 672 A.2d 1004, 1010 (Del. 1996).

24. *See, e.g., Zebroski v. State*, 715 A.2d 75 (Del.1998); *Jackson v. State*, 684 A.2d 745 (Del.1996); *Weeks v. State*, 653 A.2d 266 (Del. 1995); *Sullivan v. State*, 636 A.2d 931 (Del. 1994); *Wright v. State*, 633 A.2d 329 (Del. 1993).

25. *See, e.g., Lawrie v. State*, 643 A.2d 1336 (Del.1994); *Gattis v. State*, 637 A.2d 808 (Del. 1994); *Red Dog v. State*, 616 A.2d 298 (Del. 1992).

26. 781 A.2d 556 (Del.2001).

27. 653 A.2d 266 (Del.1995).