

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-2000

# Weeks v. Snyder

Precedential or Non-Precedential:

Docket 98-9005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Weeks v. Snyder" (2000). *2000 Decisions.* Paper 146.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/146

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 17, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-9005

DWAYNE WEEKS,
        Appellant

v.

ROBERT SNYDER, Warden;
ATTORNEY GENERAL OF THE STATE OF DELAWARE

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. No. 96-cv-00622)
District Judge: Hon. Sue L. Robinson

Argued: January 26, 2000

Before: SLOVITER, McKEE and RENDELL, Circuit  Judges

(Filed July 17, 2000)

        Joseph M. Bernstein (Argued)
        Ste 1130
        300 Delaware Ave.
        Wilmington, DE 19801

        Adam L. Balick
        Sidney Balick & Associates
        Ste 710
        919 N. Market St.
        Wilmington, DE 19801

         Attorneys for Appellant

Loren C. Meyers (Argued)
Timothy J. Donovan, Jr.
Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801

Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, Circuit Judge.

This is an appeal from the decision of the United States District Court for the District of Delaware denying the petition of Dwayne Weeks for a writ of habeas corpus. Weeks, who pled guilty to the first degree murder of his wife, Gwendolyn Weeks, and her friend, Craig Williams, was sentenced to death. His subsequent appeals and post-conviction proceedings have been unsuccessful. He raises one narrow issue before us: whether his trial attorney afforded him constitutionally ineffective assistance of counsel in connection with his guilty plea.

Because of the nature of the proceeding, we will review the facts and procedural background in detail before turning to the legal analysis.

I.

BACKGROUND

A. The Murders of Gwendolyn Weeks and Craig Williams[1]

At 8:36 p.m. on April 10, 1992, the 911 center of the New Castle County Police received a call from Gwendolyn Weeks

_____

[1]. The summary of facts set forth here is drawn chiefly from the District Court's comprehensive and uncontested statement of facts. See Weeks v. Snyder, No. 96-622, 1998 WL 231025 (D. Del. Apr. 30, 1998) ("Weeks IV"). For another summary of the murders see Weeks v. State of Delaware, 653 A.2d 266, 268-69 (Del. 1995) ("Weeks I"). There is no significant difference between them.

who requested that police come to her apartment immediately. She told the 911 operator that someone was trying to get into her apartment, and that she believed it was her estranged husband Darryl Weeks. Gwendolyn Weeks explained that she lived in a high-security apartment complex where all visitors were announced by the security guards and that she had not authorized any visitors.

The 911 tapes then captured the grim events. Approximately four minutes after calling the 911 operator, Gwendolyn Weeks became alarmed and frightened, crying out "He's in here. He has a gun. A gun." Several gunshots and screams were heard over the open line and the operator sped the police to the caller's apartment, but they arrived too late to prevent the murders. Instead, the police officers found evidence of forced entry and the bodies of Gwendolyn Weeks and Craig Williams lying face down in the living room in a pool of blood. The police later determined that both Gwendolyn Weeks and Williams were killed while they huddled on the floor of her apartment. Gwendolyn Weeks was shot twice in the head. Williams sustained defensive gunshot wounds to his right hand and upper extremity, two wounds to his face, and a fatal wound to his head. Both victims died virtually instantaneously.

B. The Case Against Weeks

The police investigation of the murders focused immediately on Dwayne Weeks, the husband of Gwendolyn Weeks since 1983. The police discovered that during their marriage, Dwayne Weeks "subjected Gwendolyn to possessiveness, irresponsible behavior, and abuse." Weeks v. State of Delaware, 653 A.2d 266, 268 (Del. 1995) ("Weeks I"). In September 1991, Gwendolyn Weeks left her husband and moved into a high-security apartment complex specifically selected to protect her from her abusive husband. After she separated from her husband and moved into her own apartment, she contacted an attorney to discuss possible divorce proceedings.

Soon after the murders a police broadcast listed Weeks as a suspect. That same evening, a police officer stopped a vehicle leaving Dwayne Weeks' residence with Weeks, his

3

girlfriend Tammy Robinson, and her daughter. Weeks was arrested and both Weeks and Robinson were transported to police headquarters.

Robinson gave three statements to the police that night. Initially, she told the police that Weeks had been with her the entire day. She later told the police that Weeks had returned home at around 9 o'clock that evening and that she had seen a gun in a brown case on the kitchen table while she was at Weeks' house. Eventually, she confessed that Weeks said he was out with his friend Arthur Govan and told her to lie if asked about his whereabouts that evening.

Late that evening, Govan learned that Weeks and Robinson had been taken into custody and that the police wanted to talk with him in connection with the murders. Govan decided to go to the police and tell his side of the story. The next day, after being read his Miranda warnings, Govan confessed that he was present during the murders but claimed that Weeks was the only shooter. Govan explained to the officers that after Weeks had received divorce papers earlier that week, Weeks called him and tried to hire him to kill his wife. Govan said he refused Weeks' offer but that he accompanied Weeks to his wife's apartment and was present during the murders. Govan explained that after the murders, Weeks took his wife's pocketbook and the two men drove to a junk yard owned by Weeks' father to hide the gun and the pocketbook. Weeks then drove Govan to the train station and returned to his home to pick up Robinson and her daughter. Govan repeated these statements to the police two days later when the police asked more specific questions relating to the number of weapons and bullets used to murder Gwendolyn Weeks and Williams.

The police obtained a search warrant. When they searched Weeks' home they found a gun box for a .38 caliber pistol on a bookshelf in Weeks' living room. The serial number on the gun box matched one of the murder weapons recovered later at his father's junk yard.

The police determined that two guns were fired in Gwendolyn Weeks' apartment the night she and Williams

were murdered: a .38 caliber gun with copper jacketed slugs and a .32 caliber gun using lead bullets. Two weapons were subsequently recovered from the junk yard owned by Weeks' father: a .38 caliber handgun and a .32 caliber handgun. The forensic evidence revealed that the .38 caliber gun was used to shoot Gwendolyn Weeks and fired one shot into the head of Williams. The .32 caliber gun was shot six times, twice into the floor and four times into Williams. In addition to the two weapons, the investigators recovered from the junk yard a partially used box of .38 caliber copper jacketed bullets, a make-up kit, a purse, a wallet, a checkbook, an address book, and various cards and papers. Gwendolyn Weeks' name appeared on the address book and the checkbook.

Armed with evidence that two guns were used in the murders, the police arrested Govan who, after signing a waiver of rights form, confessed to shooting Williams. Weeks and Govan were jointly indicted in Delaware for, inter alia, two counts of first degree murder for the deaths of Gwendolyn Weeks and Williams. The criminal case against both Weeks and Govan was listed before the Delaware Superior Court, which is the state trial court. Judge John E. Babiarz presided throughout. The court granted the State's motion to sever the trials of the defendants and to schedule Weeks' trial after Govan's.

Govan's trial proceeded before a jury. Despite his attempts to suppress his three statements to the police, the court admitted Govan's two earlier statements as well as his confession. The jury convicted Govan on all counts of the indictment. The jury in the penalty hearing decided that the aggravating circumstances outweighed the mitigating circumstances, thereby recommending that the judge sentence Govan to death. The trial judge reserved making a decision so that he could sentence Govan and Weeks together.

C. June 15, 1993 Chambers Conference

At about 4 p.m. on June 15, 1993, attorneys for the State, Weeks, and Govan met with the trial judge to discuss a potential plea of guilty by Weeks. Counsel for Weeks, John Willard, was an experienced criminal defense lawyer

of nineteen years who had recently tried two capital murder cases. He was also a friend of the Weeks family. Willard informed the judge that over his strenuous objections Weeks was intent on pleading guilty to the crimes, even though the State persisted on pressing for the death penalty.

>    MR. WILLARD: After meeting with the State yesterday, I discussed it again with my client and with his parents. The parents were immediately of the opinion that it was in his best interest to plead and face a jury, having admitted it rather than trying it.
>
>    I spoke to him about it last night and he thought he wanted to do that too. He said he wanted to have a chance to talk to his parents last night. He talked to them and they advised me this morning he wanted to plead, and I just left him and that's what he wants to do, Your Honor. I'm physically ill about it. It just-- I'm a trial man and I thought we were going to try it, and that's what he wants to do. I'm not terribly surprised, because from the beginning he indicated that he might want to do this, and I'm convinced that he's absolutely competent in every way.
>
>    He is an extremely deeply religious person, and that's been a big part of it. We talked about that yesterday. He made me stand there and hold his hand while he prayed about it, and this is what he wants to do, and I've discussed every facet that I can imagine about it. I discussed with him the State, Miss Epstein, graciously gave me virtually everything that she was going to come at him with at the penalty phase, and she gave me more today and I discussed that with him. He fully understands that the State intends to aggressively seek the death penalty, despite his plea, just as they would have if he went through trial.
>
>    I discussed with him the possible evidence we can offer in mitigation, the witnesses, what they would possibly testify to, and he knows what he's got for that phase.

App. at 8-10 (Office Conference Transcript of June 15, 1993).

6

After discussing scheduling matters regarding the selection of a jury, Judge Babiarz advised counsel that if Weeks chose to plead guilty, he should do so the next day. The judge explained that he thought it would be in Weeks' best interest if he pled guilty before jury selection since the judge would be able to tell the jury that Weeks had pled guilty instead of first reading the full charge against him. The judge also stated that "[i]f Weeks changes his mind and backs out, then we go ahead and select the jury on guilt or innocence." App. at 12.

The judge then turned to ascertain why Govan's attorney was present. Govan's attorney first requested the State not to seek the death penalty for Govan and to agree not to seek to admit any testimony to be given by Govan at Weeks' trial in Govan's sentencing proceeding. The State declined. Govan's attorney then advised the State that Govan would assert his Fifth Amendment privilege if called to testify at Weeks' trial. At this point, Willard objected:

> MR. WILLARD: Your Honor, I don't mean to split hairs here, but in my last capital case there was some effort to call some people and the Court ruled if we knew ahead of time they were going to take the Fifth, we couldn't call them, or attempt to call them, and I don't know if he's going to testify or not.
>
> THE COURT: If he agrees to testify voluntarily, he will testify. If he's going to assert the Fifth Amendment, he will not testify unless the State persuades me that privilege has been eliminated by his conviction, and I won't allow the State to call him as a witness to the stand to simply have him assert his Fifth Amendment.
>
> If I rule he waived it, then I'll put him on the stand, and how I force a person in that position to testify with the threat of contempt, I don't know, but that's the situation. I'm not going to let him go through a show for the jury. If he maintains that position, I simply will have to hear legal argument on whether the State can call him and whether I can take any action to compel him to testify or what. That's an open issue, as Miss Epstein indicated on the record.

App. at 17 (Office Conference Transcript of June 15, 1993).

7

The trial judge then summarized his view by stating:

> [A]s far as I'm concerned, as of now, Govan is not
> going to testify, and if the State plans to call him, they
> either have to supply me with a document that says
> that he will testify voluntarily, or present argument as
> to how I could compel him to testify.

App. at 18 (Office Conference Transcript of June 15).

D. June 16, 1993 Plea Hearing

The next morning, Weeks and his counsel appeared in
court to enter his guilty plea. At the beginning of the plea
hearing, Willard informed the judge that a doctor had
briefly examined his client and found him competent to
stand trial and to assist at trial. Willard then advised the
court that the State had agreed to drop all other charges if
Weeks pled guilty to murder in the first degree and felony
murder but that the plea would not affect the State's right
to aggressively seek the death penalty. Willard then stated:

> Because of my relationship with his family, Your
> Honor, I wanted them to know the latest events of
> exactly what was happening. They considered what I
> told them. They have their own ideas about the merits
> of that plea. They advised me to speak to my client and
> not to convey their thoughts, as they wanted this to be
> his decision completely.
>
> I met with my client two nights ago, Your Honor. I
> relayed to him the State's offer and advised him in
> great detail of the consequences of his plea. I advised
> him there would be no trial record, for purposes of an
> appeal. I advised him that the Supreme Court would
> only review the penalty. I reiterated the State's position
> regarding their seeking the death penalty. I reviewed
> each and every factor of aggravation which the State
> had given to me. I reviewed with him the evidence we
> would submit. He advised me he wished to accept the
> plea. He told me, however, that he wished to speak to
> his parents that evening prior to formally advising me
> of his decision. He said that he would speak with his
> parents that night.

8

Throughout my representations of Mr. Weeks, Your Honor, he has demonstrated to me a very sincere and deep religious conviction. He has repeatedly advised me of his shortcomings and failures, and that he was at peace with his god. He told me that he willingly accepted whatever was in store for him.

Before I left him that night, he asked me to join him in prayer about his decision. He prayed that God would give me and his family the strength, and the Court and jury to go through with this; never once voiced any concern for himself, except to ask God to give him the strength to continue with his convictions.

Your Honor, in my 19 years before the Bar I've never known a client who was more together and content with what he was doing. I advised him again that we could still go to trial as we had planned and there was absolutely no pressure for him to plead guilty. He told me he had no interest in going to trial and he wished to admit his guilt. He advised me that he was completely and fully prepared to live with the consequences of his plea.

App. at 22-25 (Plea Hearing Transcript).

Willard also gave a detailed recitation of all the advice he had given Weeks regarding his constitutional rights and the consequences of entering a guilty plea for the two capital offenses. He concluded by informing the court that, in his opinion, Weeks was entering the plea knowingly, intelligently, and voluntarily.

Your Honor, I'm content that the plea is being entered without improper threat or promise. I've advised my client that if there has been any improper threat or promise made to him that he say so now in this Court.

I've advised him that if he enters this plea today, of course, that there is virtually no likelihood of his ever being able to withdraw that guilty plea.

Having discussed all these things in great detail, Your Honor, with my client, I'm content that he's

entering that plea knowingly, intelligently and
voluntarily.

App. at 31 (Plea Hearing Transcript).

Weeks was then sworn in and questioned at length by
the trial judge. The court asked Weeks if he had listened to
his counsel's recitation and if he had any disagreements
with anything his counsel had told the court. The trial
judge asked if Weeks understood that even though he pled
guilty, the jury for the penalty phase would still learn,
through witnesses, how the State alleges the crimes were
committed. Weeks stated on the record that he understood
the proceedings and the consequences of the proceedings.
Weeks then admitted to having shot and killed Gwendolyn
Weeks and Williams on April 10, 1992.

Of critical importance on this appeal is the following
series of questions from the judge. After Weeks admitted to
having shot and killed the two victims, the judge advised
Weeks regarding Govan's refusal to testify as follows:

Q: [Judge] One other matter that I meant to mention
to you and I'll ask you about it now. I was advised
yesterday that Mr. Govan may elect not to testify
against you; were you aware of that fact?

A: [Weeks] No, I wasn't, Your Honor.

Q: [Judge] Let me be more specific about it. I know
there have been discussions between Mr. Govan's
lawyers, one of whom is present in the courtroom right
now, Mr. Pankowski, and the State about whether he
would testify in your trial against you, either in the
guilt part of the trial or in the penalty part of the trial.
They have been talking about whether that would
happen.

One of Mr. Govan's lawyers was present at the
conference that occurred yesterday between your
lawyer and the State's lawyers, and I was advised then
and the State was advised then, that Mr. Govan would
assert his Fifth Amendment Right, that is, the right to
remain silent, if he were called as a witness in your
case. It's an open question as to whether I could then
compel him to testify or let the State use his

10

statements against you and not decide it. There was uncertainty about whether that could be used against you, but as of yesterday afternoon, Mr. Govan was going to stand on that Fifth Amendment Right and call into question the State's ability to use any of that material against you.

 Now, were you aware of that?

 A: [Weeks] Yes, sir.

 Q: [Judge] Have you understood what I've said? If you have any questions, please ask me and I'll try to explain further.

 A: [Weeks] No, sir. Thank you, sir, I understand.

 Q: [Judge] You do understand that?

 A: [Weeks] Yes.

 Q: [Judge] Would that have made a difference in your decision to plead guilty? If it does --

 A: [Weeks] No, sir.

 THE COURT: Very well. I will accept the plea as being freely, voluntarily and intelligently entered and judgments of guilt are entered, and we'll proceed to jury selection on the penalty phase forthwith.

App. at 43-44 (Plea Hearing Transcript) (emphasis added).

E. Weeks' Penalty Hearing

During the penalty hearing, the State presented much of the same evidence it would have used had it gone to trial. Thirty-six witnesses testified for the State, among them several of Gwendolyn Weeks' and Williams' friends, relatives, and co-workers. The officers and detectives testified about the guns, bullets, and shell casings, and an FBI agent testified regarding the forensic evidence. An attorney testified that she had met with Gwendolyn Weeks just prior to the murders regarding a possible divorce and the legal implication of her husband's recent request to refinance their home. Robinson testified that she had seen a gun in a brown case on Weeks' kitchen table, and that on the night of the murders Weeks had left the house a little

11

after six p.m. and did not return until around nine p.m. She also testified that Weeks instructed her to lie to the police and tell them he was with her the entire evening.

Most significant was the evidence of Weeks' elaborate plan to murder his wife provided by his accomplice Govan, who testified before the jury under an agreement with the prosecution. In exchange for Govan's testimony, the prosecution agreed not to use Govan's testimony against him in any other proceeding. The prosecution also agreed to recommend that the court consider Govan's testimony a mitigating factor in his sentencing.

Govan testified that Weeks had learned that his wife was going to divorce him and he did not want to divide the property or pay her alimony, so he devised a plot to murder his wife: "[h]e [was] not going to let her take all he worked for, cars, stuff like that." App. at 189. Three days before the killings, Weeks tried to hire Govan to kill his wife and offered to pay him $500 or $250 and a gun, an offer Govan claimed he turned down. Weeks purportedly wanted Govan to murder her rather than perform the act himself, so that Weeks might pass a polygraph test if asked if he killed his wife.

On the day of the murders, Weeks drove Govan to St. Francis Hospital, where Gwendolyn Weeks worked, so that Govan could case the area and familiarize himself with where she worked, what exit she used, and where she parked her car. The plan was to kill Gwendolyn Weeks after she left work in the parking garage where she regularly parked. In the early evening, Govan and Weeks hurriedly returned to St. Francis Hospital to catch Gwendolyn Weeks, who was scheduled to get off work at 8:30 p.m. After the two unsuccessfully searched the parking garage for her car, Weeks telephoned one of her co-workers at the hospital and learned she was not at work because she had plans that evening.

Weeks and Govan then sped to Gwendolyn Weeks' high-security apartment. According to Govan, Weeks had learned that Williams might be with Gwendolyn Weeks that evening and, if so, "he going to get the same thing she get." App. at 205. Weeks parked in a nearby church parking lot to avoid

12

detection by the apartment complex's security and proceeded to Gwendolyn Weeks' apartment. Weeks gave Govan the .32 caliber gun on the landing and told him to knock on the door, ask for a cup of sugar, and pretend to be a neighbor.

When no one answered the door, Govan began to walk away; Weeks, however, pulled out a .38 caliber handgun, forced the door open, and entered the apartment with Govan on his heels. Govan testified that after Weeks broke the door down, Weeks ran straight at Gwendolyn Weeks, wrestled with her while she was on the phone as she tried desperately to move the gun away from her head, and then shot her twice in the head. Govan claimed that he fired two shots into the floor to make Weeks think he had shot Williams. Govan also claimed that after Weeks had killed Gwendolyn Weeks, Weeks turned and shot Williams several times in the head. When Govan was asked how six shots were fired out of the .32 caliber revolver, he claimed that he only fired two shots and then gave the revolver back to Weeks, who fired the remaining four shots.

Hoping to conceal the nature of these murders, Weeks took Gwendolyn Weeks' purse so that the murders would look like a robbery, and the two fled the murder scene to the approaching sound of police sirens. Weeks drove to a lot owned by his father and hid the purse and murder weapons in one of the trucks on the lot. Weeks then dropped Govan off at the train station, telling him, "I got her like I wanted to get her. I got her good. Got both of them good," and returned home to his girlfriend Robinson. App. at 214. According to Govan, part of the master plan was for Robinson to provide Weeks with an alibi by pretending Weeks was with her in Philadelphia during the time of the murders.

When confronted with his inconsistent statements to the police, Govan admitted that he lied to the police in order to appear more innocent. Finally, before Govan was excused, the court asked Govan to explain how Gwendolyn Weeks was found lying on top of Williams if she was shot first as he testified. Govan said he did not know but acknowledged that when he left the apartment that night, Gwendolyn Weeks was lying on top of Williams.

13

At the conclusion of Weeks' penalty hearing, the jury deliberated for two days before finding that the aggravating circumstances outweighed the mitigating circumstances on each count. On September 7, 1993, the trial judge sentenced Weeks to death and Govan to consecutive life terms.

F. Weeks' Delaware Post-Conviction Proceedings

Weeks exhausted his direct appeal to the Delaware Supreme Court, which rejected all Weeks' claims of error and affirmed. See Weeks I, 653 A.2d at 275. Thereafter, Weeks filed a motion for state post-conviction relief. The petition claimed that Weeks received ineffective assistance of counsel from his trial counsel because:

> (1) Weeks' attorney did not advise him [prior to his guilty plea] that Govan would refuse to testify against him in the trial;
>
> (2) Weeks' attorney did not advise him that if Govan persisted in his refusal to testify, then Govan's out-of-court statement to the police would not be admissible in Weeks' trial, thereby substantially weakening the State's case against Weeks; [and]
>
> (3) Weeks' attorney failed to tell Weeks that the State would present the very same evidence concerning the circumstances and details of the crime in the penalty hearing that would have been presented if Weeks had elected to go to trial on the issue of guilt.

App. at 420 (Motion for Post-Conviction Relief).

Weeks' petition conceded that "Weeks told Willard that he was in favor of entering a guilty plea because he believed that such a plea would somehow spare the victims' family and his family from the additional trauma of having all of the details and circumstances of the crimes brought out in court." App. at 419 (Motion for Post-Conviction Relief).

Judge Babiarz, the same judge who presided over the guilty plea hearing and sentencing, held an evidentiary hearing on September 8, 1995 at which both Weeks and his counsel testified and presented starkly conflicting

14

testimony. Willard declared that from the day of Weeks' arrest, Weeks immediately began talking about accepting responsibility for the killings by pleading guilty. As Willard testified:

> My very first meeting with Dwayne, he made it very, very clear to me that he had a very close, warm, personal relationship with Jesus Christ, his savior and Lord, and throughout every conversation, that came up and was part of everything.
>
> And in fact, virtually every time I met with Dwayne he would ask that we pray together. He would take my hands in his and we'd sit there and we'd pray.
>
> Now, while I may not have a reputation for that, I happen to be a very deeply religious man in my own way, and I was very touched by that, and we were very close and very open from the very, very first meeting.
>
> He is the one who began immediately talking about a plea.

App. at 443-42 (Post-Conviction Hearing Transcript).

> [F]rom our first meeting and virtually every meeting thereafter he would say to me, "Mr. Willard, I did it" and say things like, "We don't have to do this, we don't have to go to trial, I did it."

App. at 455 (Post-Conviction Hearing Transcript).

When asked how he responded when Weeks immediately revealed his desire to plead guilty, Willard testified that at that time he knew nothing about the case and kept reminding Weeks "we don't make any decisions yet. There's a whole lot of things we've got to go through first, preliminary hearings and discovery and so forth before I can have any idea of where we are in this matter." App. at 444-45 (Post-Conviction Hearing Transcript). Willard stated that from the beginning he had an overwhelming desire to go all the way and try this case to the best of his ability.

Willard further testified that as the trial approached, he continued to counsel Weeks against pleading guilty so long as the State continued to seek the death penalty. It was his position that if there was any possibility of a deal, part of

15

the deal must include the State not pursuing the death penalty. When the State offered to drop the miscellaneous charges if Weeks pled guilty to first degree murder, he "felt compelled then to at least formally broach that with[his] client" but that "[i]t was basically nothing. It was not an offer. It was plead guilty and they would still go for the death penalty and they still intended to put on a full show for the penalty phase hearing." App. at 452 (Post-Conviction Hearing Transcript). Willard testified that he "tried to explain to [Weeks] that to [him] . . . pleading guilty was a worthless thing to do." App. at 456 (Post-Conviction Hearing Transcript).

But the testimony of both Weeks and his own counsel is in agreement that Weeks was determined to confess his guilt due to his religious convictions and his desire to avoid inflicting further pain on the victims' families and his own. According to Willard's testimony, Weeks never once said "let's have a trial on this" or indicated a desire to make the State prove its case. To the contrary, Willard stated "I'm the one who kept talking about a trial, trial, trial and he never said anything. He just would say, `Well, I did it' and so forth." App. at 490 (Post-Conviction Hearing Transcript).

When asked if he informed Weeks that Govan may not testify, Willard stated that following the conference with the judge, he immediately returned to Weeks and discussed at great length the fact that Govan might not testify and that this would seriously weaken the State's case. Willard also testified that although he was hopeful that Govan would not testify, he was not optimistic since Govan remained eager to avoid the death penalty by cutting a deal with the State.

> [Willard] I thought that [Govan would not testify] was an outside possibility, and again my initial impression was like this. Govan has been tried, convicted and he's been through a penalty phase. He knows the jury's verdict, vote.
>
> I would imagine that there's a whole lot of defendants out there who may be a little tougher or more sophisticated than Mr. Govan who would say, "I've got absolutely nothing in the world to gain by helping the State and they can go to hell . . . ."

16

I quite frankly hoped in my heart that that might happen. Yet I could tell from the way Eddie [Govan's attorney] was playing it and the way the State was that there was something going on that might change that and make him want to testify.

App. at 465 (Post-Conviction Hearing Transcript).

Weeks' testimony in the post-conviction hearing differed markedly from Willard's on many significant facts. Weeks testified that he initially considered pleading guilty only if he could avoid the death penalty, App. at 492; that Willard failed to advise him that pleading guilty would not spare the victims' families the trauma of a trial, App. at 502; and that Willard never told him that Govan was threatening not to testify, App. at 508, or that if Govan refused to testify Govan's out-of-court statements could not be used against him, App. at 510. Weeks admitted that he knew that Govan's testimony would "hurt me bad," App. at 509, that Willard met with him the evening before he pled guilty (the evening following the conference with the judge where Willard was informed that Govan might not testify), App. at 523, and that he repeatedly told his attorney that he wanted to plead guilty to spare the victims' families and his own, App. at 497, 512-13.

Weeks was then presented with his statements at the time of his guilty plea when the trial judge questioned him regarding his understanding that Govan would not testify and its implications. Weeks was asked to re-read the portion of the transcript where the trial judge informed him that Govan was threatening not to testify and that it was an open question whether Govan could be forced to testify or whether his out-of-court statement could be used against Weeks. Weeks was asked to explain why he told the judge that it would not make a difference in his decision to plead guilty if Govan refused to testify against him. Weeks stated that he understood what the judge was saying, but explained as follows:

Q: You answered `No, Sir.' You said it wouldn't make a difference. Why did you say that?

A: [Weeks] Well, one, because of my understanding that I had concerning the families and them not being

17

brought back into this thing, you know, of a fullness, not re-living this thing over again.

That weighed heavy on my heart and I didn't want to bring them back through that. This is what I shared with Mr. Willard on a number of occasions coming up into that. That's mainly why I didn't change my plea.

App. at 512-13 (Post-Conviction Hearing Transcript).

In concluding his testimony, Weeks asserted that if Willard had informed him of the legal ramifications of Govan's refusal to testify, he would not have pled guilty.

Q: Now, if anyone had explained to you the legal ramifications of Arthur Govan not testifying, and if, in addition to that, you knew that you weren't going to spare anybody anything by pleading guilty, would you have pled guilty?

A: [Weeks] No. We'd have went to trial.

App. at 515 (Post-Conviction Hearing Transcript).

As the testimony by Weeks conflicted sharply with that of his counsel, Judge Babiarz stated in his written opinion denying post conviction relief that the resolution of Weeks' claims "rests primarily on [the] credibility" of Weeks and his counsel. State of Delaware v. Weeks, No. 92010167DI, slip op. at 2 (Del. Super. Ct. Dec. 28, 1995) ("Weeks II"). The court re-characterized Weeks' claims as raising two instances of ineffective assistance of counsel:

(1) that Weeks' trial counsel failed to inform Weeks, prior to the entry of his guilty plea, that Govan might refuse to testify at Weeks' trial, and

(2) that Weeks' trial counsel failed to inform Weeks that even if he pled guilty to the murder charges, the State would present the same evidence in the Penalty Hearing concerning the circumstances of the killings that they would have presented at trial.

Id.

After reviewing the transcripts of the office conference, Weeks' plea colloquy, and the testimony from the evidentiary hearing, the court adopted Willard's version of

18

the events leading up to the guilty plea. With respect to Weeks' first claim of ineffectiveness, the court specifically found that Weeks "was informed of Govan's indecision" about whether to testify. Id. at 3. With respect to the second claim, the court concluded that Weeks was aware that the State would offer evidence of the circumstances of the crime at the penalty hearing. The court therefore dismissed Weeks' claims as unsubstantiated, a decision the Delaware Supreme Court affirmed in a brief opinion, see Weeks v. State of Delaware, 683 A.2d 60, 1996 WL 470717 (Del. 1996) (table) ("Weeks III"), and Weeks was scheduled for execution.

G. Weeks' Federal Habeas Petition

On December 20, 1996, Weeks filed this habeas petition pursuant to 28 U.S.C. S 2254, reasserting his claim of ineffective assistance of counsel. Because Weeks' petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the provisions of that Act are applicable. Weeks argued that his legal representation was deficient because Willard failed to research the legal implications of Govan's refusal to testify and failed to inform Weeks of the legal ramifications of that refusal. The District Court determined that this issue was presented in the state post-conviction appeal process and thus satisfied AEDPA's exhaustion requirement. Weeks v. Snyder , No. 96-622, 1998 WL 231025, slip op. at 44-45 (D. Del. Apr. 30, 1998) ("Weeks IV").

Turning to the merits of the claim, the District Court concluded that Willard's legal representation did not fall below the acceptable level required by the Sixth Amendment as his failure to research this issue was excused once he realized that the strength of the State's case was not a factor in Weeks' decision to plead guilty. Id. at 51. The District Court also concluded that Weeks failed to demonstrate prejudice because the court was convinced from evidence in the record that Weeks would have pled guilty even if Willard had informed Weeks that Govan's out-of-court statements might be inadmissible at trial. Id. at 64. Although the District Court denied Weeks' petition, it certified the ineffective assistance claim for appeal and

19

granted a stay of execution pending appeal. Id. at 65. Weeks filed a timely appeal to this court. We have jurisdiction pursuant to 28 U.S.C. SS 1291 and 2253.

II.

DISCUSSION

A. Applicable Legal Principles

Weeks' only claim before us is based on his contention that he was deprived of his Sixth Amendment right to effective assistance of counsel, an element of a defendant's fundamental right to a fair trial. See Roe v. Flores-Ortega, 120 S. Ct. 1029, 1034 (2000); Nix v. Whiteside , 475 U.S. 157, 175 (1986); Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that counsel's representations were objectively deficient and, with a few notable exceptions, that prejudice resulted from these alleged deficiencies. See Flores-Ortega, 120 S. Ct. at 1037; Strickland, 466 U.S. at 687-688, 691-694; Government of Virgin Islands v. Zepp, 748 F.2d 125, 133-134 (3d Cir. 1984). A lawyer's representation is considered objectively deficient if it "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. To establish prejudice, a defendant must demonstrate that there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

"In most cases, a defendant's claim of ineffective assistance of counsel involves counsel's performance during the course of a legal proceeding, either at trial or on appeal." Flores-Ortega, 120 S. Ct. at 1037. However, the principles apply equally to those defendants who have pled guilty. In Hill v. Lockhart, 474 U.S. 52 (1985), the Supreme Court applied the Strickland two-part test for determining ineffective assistance of counsel in a case where the defendant challenged a guilty plea. Although the standard for deficient performance remains unchanged, in a guilty plea case the standard for prejudice "focuses on whether counsel's constitutionally ineffective performance affected

20

the outcome of the plea process." Id. at 59; see United States v. Nahodil, 36 F.3d 323, 326-327 (3d Cir. 1994); Dooley v. Petsock, 816 F.2d 885, 889 (3d Cir. 1987). In order for a defendant such as Weeks who challenges his guilty plea to satisfy the prejudice requirement, he must demonstrate that there is a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59. "As with all applications of the Strickland test, the question whether a given defendant has made the requisite showing will turn on the facts of a particular case." Flores-Ortega, 120 S. Ct. at 1039.

B. Deficient Performance

Weeks argues that Willard's representation was deficient because Willard failed to inform him fully of the legal implications of Govan's refusal to testify. In so doing, Weeks does not contest on appeal the express factual finding by the Delaware court that Willard alerted Weeks that Govan was refusing to testify. Rather, Weeks contends that if Willard had researched the legal issues, he would have learned that there was nothing that the State or the trial court could have done to compel Govan to testify and, more importantly, that if Govan refused to testify the State could not admit his out-of-court statements against Weeks under Delaware's rules of evidence. His position, succinctly stated, is: "Weeks did not receive critical legal advice that was essential to making an informed and conscious decision whether to plead guilty or go to trial[;] [s]imply being told that Govan would not testify was not enough." Appellant's Br. at 24.

AEDPA provides that factual determinations made by a state court are presumed correct and that the petitioner has the burden to rebut the presumption by clear and convincing evidence. See 28 U.S.C. S 2254(e)(1). Weeks argues that the Delaware court failed to make a factual determination necessary to his claim of ineffective assistance of counsel when it rejected his Sixth Amendment claim as "unsubstantiated." The District Court agreed with Weeks that the Delaware court failed to make such a finding. See Weeks IV, 1998 WL 231025, at *22.

21

Although the Delaware court made no express finding in its post-conviction opinion as to whether Willard advised Weeks of the legal ramifications of Govan's refusal to testify, we believe the District Court gave a far too narrow interpretation to the Delaware court's findings, and thereby violated the principles of comity and the "high measure of deference to the factfindings made by the state courts" required by S 2254(e) and S 2254(d) (pre-AEDPA). Sumner v. Mata, 455 U.S. 591, 598 (1982); see also Miller v. Fenton, 474 U.S. 104, 112 (1985) (federal habeas courts must "give great weight to the considered conclusions of coequal state judiciary"). The federal habeas statute provides us "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by [us]." Marshall v. Lonberger, 459 U.S. 422, 434 (1983). "Thus, the factual conclusions which the federal habeas courts [are] bound to respect in assessing respondent's constitutional claims [are] . . . the finding[s] of the [State] trial court . . . and the inferences fairly deducible from those facts." Id. at 435 (emphasis added).

The Supreme Court has instructed that in habeas proceedings, "if no express findings of fact have been made by the state court, the District Court must initially determine whether the state court has impliedly found material facts." Townsend v. Sain, 372 U.S. 293, 314 (1963). The Court suggested that if the state court rejected the petitioner's claim on the merits in a prior state collateral proceeding "but made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia." Id. The Court continued, "the coequal responsibilities of state and federal judges in the administration of federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation, properly assume that the state trier of fact . . . found the facts against the petitioner." Id. at 314-15. See also LaVallee v. Delle Rose, 410 U.S. 690, 692 (1973) (per curiam) (providing presumption of correctness required by 28 U.S.C.S 2254(d) to implicit findings of a state court).

22

Following this precedent, this court recently held that we must provide the same presumption of correctness required by S 2254(e)(1) to the state courts' implicit factual findings as we provide to express findings of the state courts. See Campbell v. Vaughn, 209 F.3d 280, 285-86 (3d Cir. 2000). Accord Goodwin v. Johnson, 132 F.3d 162, 183 (5th Cir. 1998); Sprosty v. Buchler, 79 F.3d 635, 643 (7th Cir. 1996); Ventura v. Meachum, 957 F.2d 1048, 1055 (2d Cir. 1992); Tinsley v. Borg, 895 F.2d 520, 524 (9th Cir. 1990); Crespo v. Armontrout, 818 F.2d 684, 686 (8th Cir. 1987).

One of the three grounds Weeks asserted in his state post-conviction proceeding in support of his contention that his Sixth Amendment right to counsel was violated was that "Weeks' attorney did not advise him that if Govan persisted in his refusal to testify, then Govan's out-of-court statement to the police would not be admissible in Weeks' trial, thereby substantially weakening the State's case against Weeks." App. at 420 (Motion for Post-Conviction Relief). At the evidentiary hearing, Willard testified that he not only advised Weeks that Govan was threatening to refuse to testify, see App. at 466, but also that without Govan's testimony the State's case was much weaker, see App. at 470. He testified that he discussed the situation thoroughly with Weeks and that he specifically spoke with Weeks of the legal technicalities if Govan refused to testify, see App. at 477-78, and told Weeks that he would not spare the victims' families by pleading guilty because the State would present the same evidence at trial, see App. at 459.

In contrast, Weeks testified at the same hearing that Willard never told him that Govan was refusing to testify or the legal implications on the admissibility of Govan's out-of-court statements, see App. at 504, and said that Willard never told him that he would not spare his or the victims' families any trauma by pleading guilty, see App. at 502. Other conflicts between Willard and Weeks permeate their respective testimonies. For example, Willard testified that Weeks continuously rejected his advice that Weeks not plead guilty unless the State agreed not to pursue the death penalty, see App. at 449-50, while Weeks testified that it was his position from the beginning that any guilty

23

plea include such an agreement from the State, see App. at 492.

After hearing the testimony of both Weeks and Willard, the Delaware Superior Court stated that "[s]ince Willard and Weeks are in direct contradiction as to what was said between them, the resolution of the disagreement rests primarily on credibility." Weeks II, slip op. at 2. The court, weighing the credibility of the two witnesses, adopted Willard's version of the events leading up to the guilty plea. The court stated that "Willard testified that he informed Weeks about the possibility that Govan may not testify" and it found, based on this testimony and the plea colloquy, that "Weeks was informed of Govan's indecision" and "knew that similar evidence would be presented at the penalty hearing regardless of his guilty plea." Id.  at 3, 4 (emphasis added).

Although the court never expressly rejected Weeks' contention that Willard failed to inform him about the effect of Govan's refusal to testify, it did find that the factual bases for Weeks' claims of ineffectiveness on the part of counsel were "unsubstantiated." Id. at 4. It is significant that the state post-conviction judge was the same judge who presided over the guilty plea hearing and the sentencing. After reviewing the Superior Court's ruling on Weeks' post-conviction motion, the Supreme Court of Delaware affirmed, stating that "[t]he Superior Court, in its decision denying the Rule 61 motion, carefully considered all of Weeks' arguments." See Weeks III, 683 A.2d 60, 1996 WL 47017.

It is reasonable to draw from this record the inference that the judge who heard the evidence determined that Willard's testimony on this issue was more credible than Weeks', as that judge had credited Willard on every other factual dispute that he expressly reached. We therefore conclude that the Delaware court made the implicitfinding that Willard advised Weeks of the implications of Govan's failure to testify, a finding entitled to deference. As noted above, this implicit factual finding is due the same highly differential presumption of correctness required by S 2254(e), which Weeks has failed to defeat by clear and convincing evidence. It follows that Weeks failed to show

24

that Willard's legal performance was objectively deficient, the first prong of a showing of ineffective assistance of counsel. Nonetheless, in an abundance of caution, we will consider as well the prejudice prong.

C. Prejudice

As Justice O'Connor emphasized in Flores-Ortega , "[t]he second part of the Strickland test requires the defendant to show prejudice from counsel's deficient performance." 120 S. Ct. at 1037. Thus, even if Weeks established that his counsel's performance was objectively unreasonable, he must also demonstrate that "there is reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59. The Court in Hill stated that the prejudice inquiry in many guilty plea cases "will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through trial." Id. Thus, as the Supreme Court explained in Strickland, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

In order to examine the prejudice issue, we mustfirst determine what Willard would have learned had he researched the effect of Govan's refusal to testify. We must then determine whether there is a reasonable probability that if Weeks had been informed of the results of this research, he would have insisted on going to trial.

In this connection, it is important to recall that Govan had given three inculpatory statements shortly after the murders, each of which placed the principal responsibility on Weeks but which also implicated Govan to differing extents. Weeks contends that under the applicable Delaware rule of evidence, the prosecutor cannot use the prior statements of an accomplice as affirmative evidence if s/he refuses to testify. See 11 Del. C.S 3507.2 As stated by

_____

2. Section 3507 of the Delaware Code provides:

> (a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

25

Weeks, "if Govan had refused to testify and therefore could not be cross-examined, his out-of-court statements inculpating Weeks would have been inadmissible against Weeks." Appellant's Br. at 22-23. The parties agree that there was no effective way to compel Govan to testify if he was unwilling, as effective sanctions would be unavailable inasmuch as Govan was already facing at least a life sentence. Although the parties disagree as to whether Govan's prior statements would have been admissible even if he chose not to testify, this appeal does not turn on that issue.3

Weeks' point is that Willard failed to tell him that they may not have been admissible. However, even if Willard did not tell him, he could not have been prejudiced because the trial judge told him. During Weeks' guilty plea colloquy, which took place while the parties were aware of Govan's equivocation about testifying, Judge Babiarz stated to Weeks in open court that it was an "open question" whether Govan's prior statements would have been admissible. The court stated:

> It's an open question as to whether I could then compel him [Govan] to testify or let the State use his statements against you and not decide it. There was

_____

> (b) The rule in subsection (a) of this section shall apply regardless
> of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without
> a showing of surprise by the introducing party.

> (c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.

11 Del. C. S 3507.

3. Compare Keys v. State, 337 A.2d 18 (Del. 1975) (holding that out-of-court statement by accomplice (who was not a codefendant) inadmissible) with State v. Miller, 1991 WL 166436 (Del. Super. 1991) (raising possibility of admissibility under traditional hearsay exception if confrontation clause satisfied) and Earnest v. Dorsey, 87 F.3d 1123 (10th Cir. 1996) (same).

26

uncertainty about whether that could be used against you, but as of yesterday afternoon, Mr. Govan was going to stand on that Fifth Amendment Right and call into question the State's ability to use any of that material against you.

App. at 43-44 (Plea Hearing Transcript). This summary by the judge was an accurate and simple synopsis of the legal ramifications of Govan's refusal to testify. See supra note 3. When the judge asked Weeks, "If you have any questions, please ask me and I'll try to explain further," Weeks responded "No, sir. Thank you, sir. I understand." App. at 44. (emphasis added). The judge then asked Weeks if this information would have made a difference in his decision to plead guilty, to which Weeks responded, "No Sir." App. at 44.

This colloquy beli