**Ralph E. SWAN, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**Nos. 509,2001, 546,2001.**

Supreme Court of Delaware.

Submitted: Nov. 13, 2002.
Decided: April 9, 2003.

Leo John Ramunno (argued), Wilmington, for appellant.

Kim E. Ayvazian and John Williams (argued), Department of Justice, Georgetown, for appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

STEELE, Justice:

This is Ralph Swan's direct appeal from his conviction for the murder of Kenneth Warren and related charges.[1] In this appeal, Swan asserts seven grounds of error: (1) the trial judge erred by failing to disqualify one of Swan's court-appointed attorneys; (2) the trial judge erred by allowing the State to introduce various out of court statements made by Swan and his co-defendant, Adam Norcross; (3) the prosecutor's remarks during the penalty phase of the trial denied Swan the right to a fair trial; (4) the trial judge erred as a matter of law and abused his discretion by including a general unanimity instruction and by failing to instruct on an accomplice culpability for the degree of homicide; (5) there was insufficient evidence presented at trial to sustain the convictions; (6) the Delaware death penalty statute is unconstitutional; and, (7) this court's statutorily mandated review of Swan's sentence requires the Superior Court to impose a sentence of life imprisonment rather than a death sentence.

After carefully reviewing the record and considering his claims, we are satisfied that the trial judge did not abuse his discretion in his evidentiary rulings and that Swan received a fair trial. We also hold that the 1991 Delaware death penalty statute, as applied to Swan, is constitutional. Finally, having reviewed the facts and circumstances of the crime and relevant information about Swan as mandated by statute, we conclude that the imposition of the death sentence is proportionate. Accordingly, we affirm.

## I. Factual and Procedural Background[2]

Shortly after 8 p.m. on November 4, 1996, the Warren family was settling in for the night in their Kenton, Delaware home. Kenneth Warren was sitting at the kitchen bar eating a sandwich while his wife, Tina, and their 19–month–old son, Dustin, were sitting on the family room couch watching television. Tina's mother Lillian had just left, after babysitting Dustin while Tina attended an aerobics class. Suddenly, two armed, masked men dressed in camouflage burst through the glass patio doors leading to the family room. They immediately ran into Kenneth and a struggle ensued. The intruders shot Kenneth four times, killing him, while his wife and son watched. The intruders grabbed Tina's purse from the kitchen counter and fled. During the commission of this crime, Tina Warren observed that both assailants carried handguns. One of the handguns appeared to be bronze or copper colored. One assail-

---

1. A Grand Jury indicted Swan for: three counts of Murder in the First Degree (one count of intentional murder and two counts of felony murder); Robbery in the First Degree; Burglary in the First Degree; five counts of Possession of a Firearm During the Commission of a Felony; and Conspiracy in the Second Degree. The jury convicted him of all the charges.

2. Our recitation of the facts here may be liberally cross-referenced to similar facts found in the related trial of Adam Norcross. See Norcross v. State, 816 A.2d 757 (Del.2003).

ant appeared to have been shot in the left shoulder.

Ballistics evidence indicated that Kenneth Warren had been shot four times with two different types of handguns, a semi-automatic and a revolver. Kenneth was shot twice in the back; once on the left side of his head behind the left ear; and once through the top of his head. The fourth bullet, fired from a gun barrel held tightly against the top of his head, had traveled through the skull down into the back of his neck, killing him instantly. Examination of the three bullets removed from the victim's body revealed that the two back wounds had been made by a .357 caliber copper/nickel jacketed bullets manufactured by the Winchester Western Corporation under the "Silver Tip" trademark and had been fired from a revolver, manufactured by either Smith & Wesson, Ruger, or Taurus. A 10 mm/.40 S & W caliber triple copper jacketed bullet fired from a 10mm semi-automatic gun made by Smith & Wesson or Irwindale, however, caused the fatal wound.

Tina's credit cards and checkbook were found in late November 1996 behind the rear fence of the Eastern Shore Concrete Company in Middletown, Delaware. The police searched the area and discovered her pocketbook fifteen feet away from the fence and her telephone calling card just inside the fence. The discovery of the purse and its contents at the concrete plant, however, did not lead to any suspects.

Swan and Norcross both worked at the Eastern Shore Concrete Company at the time of the murder. On October 20, 1996, about a month before the murder, Norcross' former roommate reported the theft of two handguns from his residence: a .357 caliber Smith & Wesson revolver and a .40 caliber black Smith & Wesson semi-automatic handgun. Around the same time,

during the fall of 1996, another employee of the concrete plant named Matthew Howell took work breaks with Swan and Norcross. Howell later testified that a few weeks before the murder, Norcross asked whether he wanted to join Norcross and Swan in a robbery. Howell declined.

About a week later, Norcross told Howell that he drove a red sports car to a person's house located on a dark road and fired a shot at a glass patio door around the back of the house. He stated that he wore camouflage clothing and a mask that covered everything but his eyes. When he entered the house, a man came up to him and fell to his knees, grabbing hold of Norcross. Norcross put the gun to the side of man's head and pulled the trigger and the man "fell like a bag of potatoes." Norcross told Howell that Swan was hit in the shoulder either by the homeowner or crossfire. Norcross also told Howell that he had earlier robbed an armory in Middletown and stole fatigues and ration packs. He then told Howell that he grabbed a pocketbook from this house and threw it in the woods behind the concrete plant. Norcross then, allegedly in front of Howell, disposed of what appeared to be a checkbook by dropping it into a concrete product that was being poured. He also told Howell that he threw the guns into the Chesapeake and Delaware Canal and burned the clothing in a barrel. Norcross told all this to Howell because he claimed not to trust Swan and wanted someone to know what happened. Howell did not report this information to the police because Norcross threatened to kill him.

Norcross told Howell all this information a day after the incident occurred. Within a day or so after this conversation, Howell observed that Swan had injured his left shoulder and wore a bloodstained bandage. In December of 1996, Howell, Swan, and

Norcross were laid off from the concrete plant.

Norcross dated Gina Ruberto during his employment at the concrete plant. She observed Norcross with a black handgun that had to be clicked back to operate. Ruberto also testified to seeing a big green duffel bag in Norcross' bedroom. Ruberto testified that Norcross was upset one night and showed her a newspaper article about a murder and robbery. Norcross started crying and told her about breaking into the back of a home occupied by a man and his wife while wearing camouflage clothing. Norcross stated that he took a pocketbook and disposed of it behind a fence at the concrete plant. Norcross also stated that he threw the weapon in the water and burned the clothing in the green duffel bag. Two weeks later, Ruberto saw Swan's left arm in a sling. A few months later, she saw Swan without a shirt and noticed a purplish bruise or scar on his shoulder. She asked Swan about the scar and Swan stated he hurt his shoulder while boxing.

In 1997, Norcross worked as a farmhand near Chesapeake City, Maryland. He married Bridget Phillips in April, and in June or July of that year, Norcross invited Swan to work at the farm. Swan moved into the same house with the couple, and one day Phillips overheard a loud conversation between the two men. They were laughing about an incident where Swan had been shot. Norcross then explained to his wife that he and Swan had planned to "rob" an empty home, but found it occupied. He told her that the victim fired a shot and died because he "tried to play hero." Later, Phillips saw Swan without his shirt and observed a scar on his left shoulder. Norcross pointed to the scar and said that scar resulted from a gunshot. Swan responded by sticking his finger in the scar and saying, "Yes, and the bullet is still in there." Norcross also told Phillips that they would never be caught because they had worn masks.

Norcross and Phillips separated in December 1997, and two years later she contacted the Delaware State Police. The police arrested Norcross on February 9, 2000, and he gave a statement the following day. Norcross admitted that he was present during the incident, but in this version of the story, said that Swan killed Warren. Norcross claimed that Swan started shooting, but that Norcross' gun would not fire. Swan allegedly grabbed Norcross' gun, cleared it, and then used it to shoot Warren in the head. After the two men started running to Swan's car, Swan told Norcross that he wanted to go back and kill the woman because she was a witness. Norcross stopped Swan by shooting him in the shoulder. The two men, who both worked at the Eastern Shore Concrete Company in Middletown, disposed of Tina's purse and their weapons the next day.

On a morning scheduled for preliminary hearings, Swan and Norcross were in separate holding cells in the Kent County courthouse when correctional officers intercepted a note Swan had dictated to an inmate. In the note, Swan warned Norcross not to trust or talk to his attorney and gave his grandmother's telephone number as a means of communicating with him. Swan further warned Norcross, "Don't say anything or if you did, say you lied." Swan also told another inmate that he had nothing to worry about as long as Norcross kept his mouth shut.

Warren's mother testified that she noticed a red car parked nearby when she left shortly before the murder. Several witnesses testified that Swan owned a red Dodge Daytona at the time of the murder and later painted the car blue/black in April 1997. Additional testimony revealed

that Swan was placed on restricted duty at the concrete plant due to a shoulder injury and that he had a scar on his left shoulder consistent with a gunshot wound.

Swan was a martial arts boxer and presented an alibi defense that he had sparred with a professional boxer named Michael Stewart from October 1996 through November or early December 1996. He also presented evidence that the scar on his shoulder could not have resulted from a gunshot wound and that he showed no signs of injury when he participated in a February 8, 1997 kickboxing tournament.

Swan's trial for Murder First Degree and related charges began on June 5, 2001. The jury found Swan guilty of all charges. At the penalty hearing following the conviction for Murder First, the jury voted seven to five that the aggravating circumstances outweighed the mitigating circumstances. On October 3, 2001, after considering the jury recommendation, the trial judge sentenced Swan to death.

## II. Swan's Allegations of Error

### A. The Request for Disqualification of Counsel

 Swan first argues that the trial judge should have granted him a new trial because, during the guilt phase of the proceedings against him, the Governor of Delaware nominated Swan's attorney, David Jones, for a position as a Family Court Commissioner. Kenneth Warren's aunt is Delaware State Senator Nancy Cook. Swan claims Senator Cook's ability to influence other Senators who would vote in Jones' confirmation resulted in a conflict of interest. This Court reviews a trial

judge's denial of a motion for new trial for an abuse of discretion.[3]

During one of Jones' initial interviews with Swan, Jones told Swan that he discussed a nomination for an appointed position with Senator Cook the previous year, that Jones would continue to seek the nomination, but that Jones did not have a personal relationship with Senator Cook and had only spoken to Senator Cook on one or two prior occasions. Swan moved for new counsel approximately one year before the trial took place. The trial judge denied the motion. Swan raised the same objection when he moved for a new trial during the penalty phase of his trial. Specifically, Swan claimed that the relationship between Senator Cook and Jones created an "appearance of impropriety" that may have affected Swan's Sixth Amendment rights. In response, the trial judge noted that Senator Cook abstained from voting on Jones' confirmation as a Commissioner. The trial judge also noted that Swan did not present any evidence of improper conduct by Jones.

 The Sixth Amendment right to effective assistance of counsel provides for representation free from conflicts of interest or divided loyalties.[4] This right applies irrespective of whether the attorney is appointed or privately retained.[5] Though the Sixth Amendment guarantees a defendant effective assistance of counsel, it does not provide the defendant counsel of his or her choice.[6] Delaware Lawyers' Rule of Professional Conduct 1.7(b) provides:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's re-

**3.** *Wilmington Country Club v. Cowee,* 747 A.2d 1087, 1092 (Del.2000).

**4.** *Lewis v. State,* 757 A.2d 709, 714 (Del.2000).

**5.** *Id.* at 715.

**6.** *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *In re Kennedy,* 472 A.2d 1317, 1331 (Del.1984).

sponsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.[7]

The comments to Rule 1.7 note that an inquiry into a conflict of interest must include an analysis of the likelihood that actual conflict will arise and the likely prejudice to the client from the conflict if it does arise.[8]

█ When a judge is alerted to possible conflicts of interest, the judge must take adequate steps to determine whether the conflicts warrant separate counsel.[9] In the recent decision of *Mickens v. Taylor*, the United States Supreme Court held that when a trial judge fails to inquire into a potential conflict of interest that he knew or reasonably should have known existed, a defendant, in order to establish a Sixth Amendment violation, must demonstrate that the conflict of interest adversely affected his lawyer's performance.[10] We do not need to decide whether the Delaware Constitution affords a defendant more protection than the United States Constitution when the trial judge fails to inquire into a potential conflict of interest.

When Swan alerted the trial judge about a possible conflict of interest, the trial judge took adequate steps to determine whether the conflict warranted new counsel. After receiving Swan's *pro se* motion, the trial judge sent a letter to Swan's counsel and asked for a response. De-

fense counsel then submitted a detailed response denying the existence of a conflict. The trial judge then ruled on Swan's claim at the proof positive hearing on June 29, 2000. The trial judge took proper steps to determine whether a conflict of interested existed after Swan filed his motion.

The trial judge also properly determined that Swan's attorney did not have a conflict of interest. The trial judge concluded that Senator Cook had no role in the nomination process of a judicial candidate and that she had abstained from voting on Jones' confirmation. The trial judge further noted that the Senate did not confirm Jones until after the guilt phase of the trial and, therefore, there was no reason for any interaction between Senator Cook and Jones at that time because his name had not yet been submitted to the Senate. The Senate did confirm him before the penalty phase but Senator Cook did not vote on his confirmation. The trial judge explained that Swan had done no more than ask the court to speculate that Senator Cook acted in some way to influence voting Senators because he could produce no evidence of improper conduct on anyone's part.[11]

We agree with the trial judge's conclusion that Jones did not have a conflict of interest when he represented Swan. Up until the release of Jones' nomination during the guilt phase of Swan's trial, Jones merely intended to submit his name if a position for Commissioner became open in the future. The Comments to Rule 1.7 note that an inquiry into a conflict of interest must include an analysis of the "likelihood that actual conflict will arise and the

---

**7.** Prof. Cond. R. 1.7(b).

**8.** Prof. Cond. R. 1.7, cmt.

**9.** *Walker v. State*, 790 A.2d 477 (Del.2002) (quoting *Wheat v. U.S.*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)).

**10.** 535 U.S. 162, 173–74, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

**11.** *State v. Swan*, 2001 WL 1012265 (Del.Super.).

likely prejudice to the client from the conflict if it does arise." Here, the likelihood of conflict was remote. Neither Jones nor Senator Cook could have known when a position would become available.

The trial judge also correctly determined that Swan failed to demonstrate any prejudice as a result of his counsel's alleged conflict of interest. Swan made no claim of deficient performance. He never specified what he believed Jones did or failed to do in light of the alleged conflict that he argued could have prejudiced his defense. Thus, Swan's argument reduces itself to the claim that the conflict created an "appearance of impropriety." [12] The trial judge further noted that Jones' defense of Swan was highly skilled and vigorous, evidenced by the fact that the jury deliberated four days before convicting Swan and on horrendously unfavorable facts recommended the death penalty by only a seven to five vote. Given the trial judge's thoughtful inquiry and reasoned conclusion, we cannot find that he abused his discretion when he denied Swan's Motions to Disqualify Counsel or for a New Trial.

B. *The Admission of Co–Defendant Adam Norcross' Statements*

■■■■ Swan argues that his co-defendant's various hearsay statements, admitted into evidence after Norcross invoked his Fifth Amendment right not to testify, deprived him of his Sixth Amendment right to confrontation. Swan argues that the statements were not reliable because Norcross provided several different versions of the incident to different witnesses.

He also argues that the use of plural pronouns and phrases in redacted statements were intended to inculpate him. He complains that Mathew Howell's testimony about Norcross' statements was admitted without redaction. He complains generally about hearsay testimony from Bridget Phillips and that the trial judge erred by not granting a mistrial when the State played a tape of Gina Ruberto's statement that included a plural phrase.

■■■■ This Court reviews *de novo* claims alleging the infringement of a constitutional right and evidentiary rulings for abuse of discretion.[13] Since Swan's co-defendant Norcross invoked his Fifth Amendment right to remain silent, he was unavailable for trial. The State was forced to rely on the statement against penal interest exception to the hearsay rule to enter Norcross' statements into evidence.[14] The trial judge ordered that any references to Swan be redacted where 804(b)(3) was relied upon for admission as well as any plural usage that in the context of the statement could unfairly implicate Swan as the accomplice. The trial judge also redacted any statement that suggested Norcross' accomplice fired the fatal shot. The trial judge permitted plural usage for statements where Swan was not implicated and Norcross was not shifting the blame.

This Court has held that the Sixth Amendment Confrontation Clause imposes strict requirements for admission of statements against penal interest if those statements also inculpate someone other than the hearsay declarant.[15] Swan relies on *Barrow v. State*[16] and *Lilly v. Virginia*[17]

---

12. Appellant's Op. Br. at 14.

13. *Williamson v. State*, 707 A.2d 350, 354 (Del.1998).

14. D.R.E. 804(b)(3) (2002).

15. *Smith v. State*, 647 A.2d 1083, 1086–90 (Del.1994).

16. 749 A.2d 1230 (Del.2000).

17. 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

to argue that Norcross' statements were not truly self-inculpatory. However, Norcross' statements are analogous to the footnote in *Barrow* where this Court explained that a statement that the hearsay declarant participated in the robbery, without stating his role, would be truly self-inculpatory.[18] Norcross specifically admitted to Howell and Phillips that he shot Kenneth Warren. In addition, Norcross fully implicated himself in the conspiracy, burglary, robbery, and murder in speaking with Gina Ruberto and the police. No reasonable person in Norcross' position would have made such statements unless he believed them to be true. Furthermore, Swan conceded at trial that those parts of Norcross' statements confessing that he was one of the two people who broke into the Warren house and planned the robbery were admissible under the hearsay exception for statements against penal interest.

 The trial judge correctly admitted Norcross' statements to his co-worker, Matthew Howell under the co-conspirators exception to the hearsay rule.[19] A statement is not hearsay if made by a co-conspirator of a party during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by a preponderance of the evidence to the satisfaction of the court.[20] This Court has held that the trial court may rely on the statement itself to establish the conspiracy.[21] Howell's statements meet the requirements of this exception because Norcross attempted to solicit Howell to join the conspiracy to commit robbery.

The trial judge properly allowed Bridget Phillips to relay Swan's adopted admissions pursuant to D.R.E. 801(d)(2)(A) & (B). Phillips testified that Norcross admitted that he and Swan were involved in the murder of Kenneth Warren. With Swan present, Norcross told Phillips that Swan was shot during the scuffle with the victim. Norcross pointed to a scar on Swan's shoulder and stated that the scar was the result of a gunshot wound that occurred during the robbery. Swan, present at the time Norcross made the statement, confirmed it. Swan then stated that the bullet is still in there, gesturing with his hand toward the scar. These statements and actions manifested Swan's adoption of belief of the truth of Norcross' statements made while Phillips was present.

The trial judge did not abuse his discretion by denying Swan's motion for a mistrial where one plural reference was not redacted from a taped statement made by Norcross' former girlfriend, Gina Ruberto. In the statement, Ruberto repeated an account of the robbery and murder that Norcross gave her shortly after the murder had occurred. Despite the trial judge's order that references to any accomplice be redacted, the State failed to redact one plural pronoun reference where Ruberto mentioned that Norcross had said "they" parked the red car near the victim's home. Upon defense objection, the trial judge immediately provided a curative instruction to the jury:

> A portion of the tape you have just heard and a portion of the transcript . . . contained material that I have ruled inadmissible. I believe that it got in there inadvertently, but I don't know that for sure.

**18.** *Barrow*, 749 A.2d at 1244, n. 12.

**19.** D.R.E. 801(d)(2)(E) (2002).

**20.** *Id.*

**21.** *Lloyd v. State*, 534 A.2d 1262, 1264–65 (Del.1987).

In any event, I have stricken that tape and that transcript from the record. They are no longer in evidence and you are to disregard anything you might recall, either from the tape or from the transcript. You may be guided by the testimony that Ms. Ruberto has given from the stand and the cross-examination you are about to hear. And the very first tape, the short tape, is still in evidence. But the tape that was just played for you is no longer evidence in this case.[22]

This instruction neutralized prejudice to the defendant, and the jury must be presumed to have followed the court's instructions.[23]

The trial judge took great pains to ensure that the portions of Swan's accomplice's statements (Norcross' confession to the police and his out-of-court statements to Howell, Ruberto, and Phillips) that inculpated Swan were redacted, as well as any portions which appeared to shift blame from Norcross to Swan, or anyone else. Norcross' statements contain sufficient guarantees of reliability and are consistent in their essential elements: that Norcross and another person dressed in camouflage clothing broke into a home occupied by a family, shot the husband, and a stole a purse. Aside from Norcross' confession, the statements made to his co-worker, his girlfriend, and his wife were not made under the pressure of a police interrogation, where a declarant, arguably, is more likely to shift blame to others in order to curry favor with authorities.

### C. The Prosecutor's Closing Remarks

Swan challenges several comments made by the prosecutor during closing argument. He contends that the comments deprived him of his right to a fair and impartial trial. All the comments were made during the guilt phase of trial. Swan objected to two of the comments claiming the first comment asked the jury to place themselves in the place of the victim and the second comment expressed the prosecutor's own opinion. Swan argues that the trial judge should have granted a mistrial upon the defense objection to those comments. The remaining comments were not objected to at trial and Swan now complains that they constituted plain error.

The law in this area is well settled. The prosecutor "represents all the people, including the defendant" and must "seek justice, not merely convictions."[24] In pursuing both goals, the prosecutor should abide by the American Bar Association's standards governing prosecution and defense functions.[25] Consistent with those standards, the prosecutor should not: (i) express personal beliefs as to the credibility of witnesses; (ii) misrepresent the evidence presented at trial; (iii) comment on the fact that a defendant exercised the right to remain silent; (iv) denigrate the role of defense counsel; (v) misrepresent the legal effect of defendant's statements; (vi) appeal to the jury's sense of personal risk or the level of safety in the community; or (vii) attempt to in-

22. Appellant's App. at 84.

23. *Lewis v. State*, 626 A.2d 1350, 1358 (Del. 1993); *see also, Capano v. State*, 781 A.2d 556, 589 (Del.2001) ("As a general rule, we must presume that 'jurors followed the court's instructions' ") (internal citations omitted).

24. *Hunter v. State*, 815 A.2d 730, 735, 2002 Del. Lexis 803, *8 (Del.Supr.2002) (quoting *Bennett v. State*, 164 A.2d 442, 446 (Del. 1960)).

25. *Id.* at 735, 2002 Del. Lexis 803 at *8–9.

flame the prejudices of the jury by name-calling or other pejorative language.[26]

Objectionable statements that were not objected to at trial are reviewed for plain error.[27] To be plain, the error must affect substantial rights, generally meaning that it must have affected the outcome of the trial.[28] Under plain error review, the error complained of must be so clearly prejudicial to substantial rights so as to jeopardize the fairness and integrity of the trial.[29] The burden of persuasion is on the defendant to demonstrate that a forfeited error is prejudicial.[30]

In the first challenged remark, Swan claims the prosecution violated the "golden rule" by asking the jury place themselves in the place of the victim. "Think about home. What is home? Come back from vacation, you want to sit there." Defense counsel immediately objected on the grounds that, "the prosecutor is asking the jury to place themselves in the place of the victim." The trial judge sustained this objection and the prosecutor rephrased the comment by referring specifically to the victim's home.[31]

The trial judge correctly and promptly sustained defense counsel's objection to the prosecutor's invocation of the "golden rule" argument. The prosecutor's reference to the sanctity of the home effectively asked the jury to place themselves in the place of the victim.

Swan next claims the prosecutor injected his personal opinion to the jury, al-though defense counsel made no objection to the following comments:

> I'm suggesting, ladies and gentlemen, that the—that what Michael Stewart's memory of that event is with regard to his involvement with Swan, the evidence would suggest, ladies and gentlemen, that perhaps Michael's mistaken.[32]

Swan claims that the prosecutor again injected his own opinion in the argument. This time, defense counsel raised an objection:

> A bullet goes boom, like that. Can't it just go there? He even gave Mr. O'Connor a tough time about three-eights of an inch or 7/16s, whatever the nonsense was. But doesn't it—concep-tualize—unless I'm just slow or some-thing, it seems to me that a bullet can go through-
>
> MR. JONES: Again, your Honor, objec-tion to injecting the prosecutor's per-sonal opinion into the argument.
>
> THE COURT: Yes, it's getting to be that, Mr. O'Neill. Let me tell you about what we're fussing about here. Our Supreme Court has said that it's improper for an attorney to say, "In my personal opinion," or "In my opin-ion," the Supreme Court thinks [it] is improper. The attorneys should use, "the evidence suggests," or things like that. They're not to put their own personal opinion or personal credibili-ty on the line. I've seen it happen over and over again, the "I" slips in, sometimes inadvertently, so just -

---

26. *Id.* (internal citations omitted).

27. *Trump v. State,* 753 A.2d 963, 970 (Del. 2000).

28. *United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

29. *Capano v. State,* 781 A.2d 556, 653 (Del. 2001).

30. *Brown v. State,* 729 A.2d 259, 265 (Del. 1999).

31. Appellant's Op. Br. at 37.

32. Appellant's Op. Br. at 38.

MR. O'NEILL: I understand, your Honor.

THE COURT: —a warning shot.

MR. O'NEILL: And I—the State will continue.

It is a well-established principle that the prosecutor has a special obligation to avoid assertions of personal knowledge.[33] The prosecutor's use of the word "I" only serves to emphasize for the jury that prosecutor's personal belief about the point being argued to the jury.[34] However, the objection and the trial judge's immediate intervention prevented the State from finishing its arguably improper presentation concerning the bullet related evidence. In addition, the prosecutor's use of "I" in discussing the testimony of Michael Stewart was later qualified by the use of the "the evidence suggests." Thus, neither comment improperly denied Swan a fair trial.[35]

In reviewing the remaining four statements, our analysis includes a review of both the statements' individual and cumulative effect.[36] Improper prosecutorial comments in closing argument only constitute plain error if credibility is a central issue, the case is close, and the comment is so clearly prejudicial that defense counsel's failure to object is inexcusable and the trial judge must intervene *sua sponte* in the interest of fundamental fairness.[37] None of the remarks challenged for the first time on appeal satisfy this three-part plain error analysis.

The prosecutor's remark that, "Friends and relatives lost a good man, a hardworking honest man" in the victim was not improper. The State is permitted to draw legitimate inferences from the record. This inference is a fair comment on the evidence and is supported by the record. The prosecutor's remark that, "It is time to do what is right as supported by the evidence. Justice demands it" is neither inflammatory nor prejudicial as the prosecutor is merely asking the jury to decide the case on the basis of the evidence. Noting that the trial against the accused is also the victim's day in court does not constitute plain error.[38] Tina Warren corroborated the prosecutor's comment that Norcross' statement indicated that Norcross committed the murder with another individual. The prosecutor merely emphasized that another witness confirmed Norcross' account. He did not impermissibly attempt to bolster a witness' credibility.

After reviewing all the prosecutor's remarks that Swan claims violated his right to a fair trial, we conclude that only the prosecutor's reference to the golden rule was improper. However, once a prosecutor's remarks are found to be improper, the inquiry does not end. The court must consider whether the remark prejudicially affected the defendant's right to a fair trial.[39] The three factors to be considered in making this determination are: (i) the closeness of the case, (ii) the centrality of the issue, and (iii) the steps taken to miti-

---

**33.** *Trump v. State*, 753 at 967.

**34.** *Id.*

**35.** There is no *per se* rule that the use of the word "I" or "we" in closing argument is improper. *Cousins v. State*, 2001 Del. Lexis 513, *3 (Del.Supr.) (citing *Trump*, 753 A.2d at 968).

**36.** *Mason v. State*, 658 A.2d 994, 999 (Del. 1995); *Michael v. State*, 529 A.2d 752, 765 (Del.1987).

**37.** *Trump*, 753 A.2d at 964.

**38.** *Diaz v. State*, 508 A.2d 861, 866 (Del.1986).

**39.** *Pennell v. State*, 602 A.2d 48, 51 (Del. 1991).

gate the effects of the error.[40] As discussed more fully in the sections of this opinion addressing Swan's claim that there was insufficient evidence to convict him of the crimes alleged and this court's automatic review of Swan's sentence, this was not a close case. In addition, although a curative instruction would have been beneficial, the trial judge did sustain defense counsel's motion and the prosecutor changed his argument to specifically refer to the victim's home. This limited, improper comment did not, standing alone or with other comments, deprive Swan of a fair trial.

### D. Jury Instructions

■ Swan argues for the first time on appeal that the trial judge erred by refusing to give the jury specific instructions that clearly separated the State's theories of intentional murder and accomplice liability. According to Swan, the trial judge should have provided a Chance[41] instruction commanding the jury to find either that Swan was the principal in committing first degree murder by firing the fatal shot, or that he was the accomplice by firing the other shots that did not kill the victim. Swan contends that the trial judge's instruction violated Swan's Sixth Amendment rights by confusing the jury to the point where some jurors may have convicted Swan as Norcross' accomplice, while others convicted him as the principal.

■ This Court reviews jury instructions for plain error when the parties fail to raise an objection at trial.[42] When a case involves two people and a single incident where the State may have difficulty proving the two's respective roles, specific unanimity instructions need not be given because a general unanimity instruction serves to prevent both persons from escaping criminal responsibility where there is compelling evidence that they jointly planned and carried out the criminal enterprise.[43]

Swan and Norcross were engaged in the same enterprise, at the same time and cannot escape liability simply because the State cannot prove which defendant inflicted the fatal wound. The jury need not unanimously decide whether Swan fired the fatal shot where both theories of liability required the jury to determine that Swan participated in the robbery and was one of the assailants that fired a weapon. As we noted in Liu, in a case involving two people and a single incident where the State my have difficulty proving their respective roles, a "general unanimity instruction serves to prevent both persons from escaping criminal responsibility, where there is compelling evidence that they jointly planned and carried out the criminal enterprise."[44] The bullets removed from Warren's body were shot from two different guns, and the record reveals that both Swan and Norcross were both active participants in the murder.

Were a Chance instruction required under these circumstances, this Court would face the same problem noted in Liu. Since the jurors cannot determine who was the principal and who was the accomplice, both Swan and Norcross could escape liability because the jury could not make a specific culpability assessment for each defendant.

**40.** Hughes v. State, 437 A.2d 559, 571 (Del. 1981).

**41.** Chance v. State, 685 A.2d 351 (1996).

**42.** McDade v. State, 693 A.2d 1062, 1064 (Del. 1997).

**43.** Liu v. State, 628 A.2d 1376, 1386 (Del. 1993).

**44.** Id.

As the jury may find both defendants guilty of the first degree murder offense without definitively finding one the principal actor, the jury must also be permitted to assign the same level of culpability to both actors since they were involved in the same criminal enterprise and where one could conclude it to be equally possible for both to have fired the fatal shot. There is here no credible argument, as in *Chance*, that Warren's death was an unintended consequence of either Swan's or Norcross' actions. Therefore, the trial judge did not err by refusing to give an instruction setting forth the varying degrees of culpability for accomplice liability.

### E. *Sufficiency of the Evidence*

█ Swan argues that there was insufficient evidence to convict him of the crimes alleged. He argues that the State's case consisted only of the uncorroborated hearsay statements of his co-defendant without any physical evidence connecting Swan to the crimes. He also argues that the jury's deliberation of four days illustrate that this is a close case. Despite these claims, Swan failed to move for a directed verdict or a judgment of acquittal at trial nor did he raise a claim of insufficient evidence in his motion for a new trial.

█ In the absence of a motion for directed verdict or for judgment of acquittal notwithstanding the verdict, this Court reviews claims of insufficient evidence for plain error.[45] Swan bears the burden of demonstrating actual prejudice and the error complained of "must be apparent from the face of the record."[46] This claim essentially summarizes Swan's previous arguments about the hearsay statements ad-

mitted at trial. Though the evidence was primarily circumstantial, this Court does not require direct evidence to sustain a verdict.[47] The jury deliberated for four days because this was a complicated case. The trial involved numerous witnesses whose testimony assembled the picture of the man who invaded the Warren home with Norcross that fateful night.

Tina Warren corroborated many of Norcross' statements when she testified that two armed and masked men burst through the rear door of her home, shot Kenneth Warren in front of Tina and their young son, and took her purse after abandoning an attempt to take Kenneth's wallet. She also testified that one of the men appeared to have suffered an injury to his shoulder. Matthew Howell, Gina Ruberto, Tina Holotanko, and Swan's foreman at the concrete plant testified to seeing a wound or injury to his left shoulder around the time of the murder. Bridget Phillips overheard Norcross and Swan talking about a time when Swan been shot and observed a scar on Swan's left shoulder to which he pointed, informing her that the bullet was still there from the murder.

Lillian Warren testified that she saw a small red sports car parked near her son's home on the night of the murder. Norcross told witnesses that he had driven to the residence in a red sports car, a red Dodge Daytona, and several witnesses testified that Swan owned a red Dodge Daytona, in which Norcross was a frequent passenger, and which Swan had painted dark blue/black in April 1997. Swan and Norcross both worked at a concrete plant in Middletown, the same plant where Tina's purse and its contents were discov-

---

**45.** *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995).

**46.** *Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986).

**47.** *Robertson v. State*, 596 A.2d 1345, 1355 (Del.1991).

ered a few weeks after the murder. Prior to being laid off, Swan was placed on light duty at the concrete plant because of his injured left shoulder. Lastly, while in custody Swan warned Norcross in a note not to talk to his lawyer or if he had, to say that he lied. The note was intercepted and Swan told his cellmate that he had nothing to worry about as long as Norcross kept his mouth shut.

There is ample evidence in the record to support the jury's verdict. Norcross' hearsay statements combined with Swan's admissions, post-arrest conduct, and various other pieces of circumstantial evidence established a prima facie case of first degree murder, felony murder, burglary, robbery, and conspiracy. Accordingly, there is no plain error evident from the record.

### F. The Constitutionality of the Death Penalty Statute

■ Swan argues that the recent United States Supreme Court decision in *Ring v. Arizona*[48] rendered the 1991 version of Delaware's death penalty statute unconstitutional.[49] *Brice v. State*,[50] decided after Swan advanced these arguments, resolves this issue. In *Brice*, this Court addressed several questions concerning the 2002 amendment to § 4209, and held that *Ring* only extends to the narrowing phase of the sentencing process. Thus, once a jury finds unanimously and beyond a reasonable doubt, the existence of at least one statutory aggravating circumstance, the defendant becomes death eligible and

*Ring's* constitutional requirement of jury fact-finding is satisfied.[51]

In this case, Swan was sentenced under the 1991 version of § 4209, which did not require the jury to find the existence of a statutory aggravating circumstance unanimously and beyond a reasonable doubt. But the jury did meet the *Brice* standard, since it convicted Swan *unanimously and beyond a reasonable doubt* of, among other crimes, two counts of felony murder under 11 *Del. C.* § 636(a)(6). A conviction under § 636(a)(2)–(7) establishes the existence of a statutory aggravating circumstance under § 4209(e)(2). In *Brice* and *Norcross*, this Court held that § 4209(e)(2) satisfies *Ring*. Thus, we conclude that the 1991 version of § 4209 is constitutional as applied to Swan.

### G. Automatic Review of Death Penalty

■ Pursuant to 11 *Del. C.* § 4209(g)(2), this Court conducts an independent review of any death sentence imposed by the Superior Court. The purpose of that review is to determine whether: (i) the evidence supports a finding of at least one statutory aggravating circumstance; (ii) the death penalty was imposed arbitrarily or capriciously; and (iii) the sentence is disproportionate when compared to similar cases arising under the statute.[52] This Court recognizes the importance of its statutory responsibility, inasmuch as "death as a punishment is unique in its severity and irrevocability." [53]

#### 1. Statutory Aggravating

**48.** 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**49.** 11 *Del. C.* § 4209

**50.** 815 A.2d 314 (Del.2003).

**51.** *Id.; Norcross v. State,* 816 A.2d at 767.

**52.** *Norcross,* 816 A.2d at 767.

**53.** *Sullivan v. State,* 636 A.2d 931, 948–49 (Del.1994) (internal citations omitted).

*Circumstances* [54]

■ The State alleged that the applicable statutory aggravating circumstances in this case were that Swan committed the murder while he engaged in the crime of robbery first degree and burglary first degree.[55] As discussed above, the jury convicted Swan of two counts of felony murder based on Warren having been murdered while Swan and Norcross committed robbery first degree and burglary first degree. Though Swan claims that there was insufficient evidence to support the jury's verdict, this Court found that there was sufficient evidence to sustain the verdict as discussed above. Nevertheless, the Court reviewed the evidence in order to make its own finding on this issue.

This was not a close case. There is no dispute that two masked intruders, wearing camouflage clothing, broke into Warren's home at night, that they killed Kenneth Warren, and that they took Tina's purse. Norcross' statements to three witnesses and his statement to the police established the fact that Swan was one of those men. Despite conflicting evidence on the question of who fired the fatal shot, as the trial judge noted, it does not matter. Swan and Norcross were both armed; both men were shooting; and Warren suffered four bullet wounds from two different guns. The trial judge correctly concluded, "[t]he evidence leaves no doubt that both defendants were acting in concert with murderous intent when Warren was killed."[56] We are satisfied that there

was sufficient evidence to support the felony murder convictions.

2. *Whether the Sentence was Arbitrary and Capricious*

■ The trial judge carefully considered a number of aggravating and mitigating circumstances in reaching his determination, consistent with the jury's seven to five recommendation, to impose the death penalty. The mitigating circumstances are minimal in the case of this defendant. His ability to function well in prison and contribute to prison welfare was noted by the trial judge as well as testimony from Swan's father, aunts, and cousins indicating a familial relationship of mutual affection. The trial judge noted that there was insufficient evidence about Swan's childhood to conclude that his upbringing was so bad that it constituted a mitigating circumstance.

The aggravating circumstances are, as the trial judge noted, "overwhelming." What happened on November 4, 1996 was "every family's worst nightmare."[57] Society deems the home as one place where a person should feel secure from the elements that may place their family at risk. The members of Warren's family may never again enjoy that feeling of safety in one's home. The fact that Swan and Norcross executed Warren in his own home in front of his wife and son is an aggravator of utmost proportions.

The ruthlessness of the crime is compounded by the fact that Swan saw the Warren family through the patio doors

---

**54.** Norcross and Swan both had separate trials. In both cases, the State alleged that the applicable statutory aggravating circumstances were that Swan and Norcross committed the murder while engaged in robbery first degree and burglary first degree. Although this Court independently reviewed Swan's death sentence, our analysis includes

several of the same points discussed in *Norcross*, 816 A.2d 757 (Del.2003).

**55.** 11 *Del. C.* § 4209(e)(1)(j).

**56.** *State v. Swan*, 2001 WL 1012265 (Del.Super.).

**57.** *Norcross*, 816 A.2d at 768.

before he broke in.[58] Swan knew he would be confronting Warren. Swan had a gun, and could have demanded valuables, Tina's purse or Kenneth's wallet. But Warren was given no chance to comply with any demands. He was attacked immediately and brutally murdered.

The trial judge also noted Swan's significant criminal history. In 1991, in Texas, he pleaded guilty to two felonies, possession of a deadly weapon and armed robbery. The trial judge was especially troubled by the facts of the armed robbery charge noting that Swan and two confederates invaded a computer business, bound and assaulted the employees, and stole over $100,000 in computer equipment.[59] Though not considered the ringleader, Swan refused to identify the others involved in the crime after his apprehension. The trial judge was further troubled by the fact that Swan served five years of a twelve year sentence and murdered Warren within a year after his release. The presence of a mask, a .32 caliber revolver, and ammunition in Swan's apartment discovered following his arrest for this murder suggested that he may have been contemplating further criminal activity.

Finally, the devastating impact of this murder on Warren's family and friends adds another aggravating circumstance. In almost any murder, there are loved ones left to grieve. But in this murder, because Warren was so close to his ex-tended family, the number of victims and the extent of their suffering is noteworthy.

In sum, the Superior Court's decision to impose the death penalty was neither arbitrary nor capricious. The trial judge found that the aggravating circumstances outweighed the mitigating circumstances and the record fully supports that finding.

### 3. Proportionality Review

The final aspect of this Court's statutory review is the determination of proportionality. The Court compares the "universe" of death penalty cases to this one to determine whether imposition of the death penalty in this case is proportionate.[60] In performing this task the Court recognizes that a "definitive comparison of the 'universe' of cases is almost impossible." [61] "[S]entencing decisions involve difficult and uniquely human judgments that defy codification and that build discretion, equity, and flexibility into a legal system." [62] "Recognizing these limitations, this Court looks to the factual background of relevant cases to determine the proportionality of the sentence imposed." [63]

As with others sentenced to death, Swan committed an unprovoked, cold-blooded execution of a defenseless victim, presumably for pecuniary gain.[64] In addition, Swan invaded the victim's home to commit the murder, a factor that has resulted in

---

58. Id.

59. State v. Adam Norcross and Ralph Swan, 2001 WL 1223198, *6 (Del.Super.) (sentencing opinion).

60. Cases governed by the 1991 amendment to § 4209 are most persuasive, but earlier cases may still be considered. Lawrie v. State, 643 A.2d 1336, 1350 (Del.1994).

61. Pennell v. State, 604 A.2d 1368, 1376 (Del. 1992).

62. Wright v. State, 633 A.2d 329, 342–343 (Del.1993) (internal citations omitted).

63. Clark v. State, 672 A.2d 1004, 1010 (Del. 1996).

64. See, e.g., Zebroski v. State, 715 A.2d 75 (Del.1998); Jackson v. State, 684 A.2d 745 (Del.1996); Weeks v. State, 653 A.2d 266 (Del. 1995); Sullivan v. State, 636 A.2d 931 (Del. 1994); Wright v. State, 633 A.2d 329 (Del. 1993).

the death penalty in other cases.[65] Finally, Swan managed to escape detection and arrest for several years resulting from his co-defendant's actions of burning his clothing, disposing of his gun, and threatening the lives of those people that he had told about the killing. Similar conduct factored into the death sentences in *Capano v. State*[66] and *Weeks v. State*.[67]

### III. *Conclusion*

After carefully reviewing the entire record, this Court concluded that the death sentence imposed on Swan is appropriate under 11 *Del. C.* § 4209. Accordingly, the judgment of the Superior Court is AFFIRMED. This matter is REMANDED to the Superior Court for further proceedings in accordance with this opinion.

---

**65.** *See, e.g., Lawrie v. State,* 643 A.2d 1336 (Del.1994); *Gattis v. State,* 637 A.2d 808 (Del. 1994); *Red Dog v. State,* 616 A.2d 298 (Del. 1992).

**66.** 781 A.2d 556 (Del.2001).

**67.** 653 A.2d 266 (Del.1995).